279 So.2d 451

**Alston M. CALLAHAN**

v.

**Henry J. WEILAND and Ellen deM. Weiland.**

**SC 98.**

Supreme Court of Alabama.

June 21, 1973.

Don B. Long, Jr., Birmingham, for appellees.

Charles A. J. Beavers, Skinner, Large & Corley, Barnett, Tingle & Noble, Birmingham, for appellant.

HARWOOD, Justice.

This is an appeal from a decree in a declaratory judgment action whereby the respondent, Dr. Alston M. Callahan was enjoined from constructing a ten story multi-unit condominium on lots 2, 3, 4, 5, and 6 located on top of Red Mountain in Birmingham, in a subdivision known as Warwick Manors.

Warwick Manors subdivision was originally laid out by the Tennessee Land Company, and a map thereof was recorded in the office of the Probate Judge of Jefferson County, Alabama, in October 1927. The United States Steel Corporation became the successor of Tennessee Land Company.

No restrictions on the use of the lots were imposed by the plat filed by the Tennessee Land Company on the use of the lots in the subdivision.

All of the lots in Warwick Manors were sold, the lots being described according to the plat as recorded. The deeds of conveyance to the different grantees contained the following limitations, restrictions, and provisions as to the use of the lots which are material to this review.

"(1) That said property shall be used by white persons only, except that any servant or servants employed on the premises may occupy servants' quarters or house;

"(2) That the said property shall be used for residence purposes only, and not for any purpose of business or trade;

"(3) That no building, except a single dwelling house with necessary outbuildings shall be erected or maintained on said property, such dwelling house to cost in its construction not less than $7500.00; it being intended hereby to prohibit, and there shall not be maintained on said premises any dairy, sanitarium, apartment house, double or duplex house, inn, boarding house or place of any sort for the serving of food or refreshments to the public, public garage, public stables, public hall, or transportation equipment for doing work under contract or hire; no dog kennels shall be maintained or pet stock raised for commercial purposes on any part of said lot;

\*   \*   \*   \*   \*   \*

"(6) Said property shall not be subdivided or reduced in size by voluntary alienation, judicial sale or other proceedings, except at the discretion and with the approval of the Tennessee Land Company or its authorized employee; \*   \*   \*"

\*   \*   \*   \*   \*   \*

"The foregoing limitations, restrictions, and conditions shall be binding upon future owners as well as upon the grantee herein, subject to the right herein reserved by the Tennessee Land Company to waive, annul or modify such limitations, restrictions or conditions. \*   \*   \*"

In 1929 the Tennessee Land Company executed a deed to Elizabeth T. Cartwright to lot 11 and a 15 foot strip of the east end

of lot 12, all in Warwick Manors. By mesne conveyances, this property became vested in the complainants herein, Henry J. Weiland and his wife Ellen.

By deed dated 15 December 1943, lot 4 in Warwick Manors was conveyed by the Tennessee Land Company to Robert S. Smith and Helen Rox Smith, and by deed dated 12 January 1944, lots 2, 3, 5, and 6, among other lots in Warwick Manors were conveyed to the Smiths. By mesne conveyances lots 2, 3, 4, 5, and 6, were acquired by the respondent Dr. Callahan.

All of the deeds executed to the predecessors in title to both the complainant and the respondent, contained the restrictions above set out, other than in the deed to lot 4, the restriction on the cost of any house to be built thereon was fixed at $15,000.00 rather than $7,500.00 as provided in the deeds to the other lots above mentioned.

On 30 December 1970, in an instrument recorded 7 January 1971, the United States Steel Corporation, as successor by merger to the Tennessee Land Company, released and relinquished all rights it had to waive, modify, annul, or enforce the restrictions relating to Warwick Manors subdivision of the Tennessee Land Company and all lots therein as shown by the recorded plat.

On 17 February 1971, the complainants entered into an agreement with Lottie S. Matthews, the then owner, to purchase lot 11 and the east 15 feet of lot 12, all in Warwick Manors, for the sum of $27,500.-00. The sale was to be closed in 15 days or the $500.00 earnest money paid by the complainants was to be forfeited. The property was to be conveyed subject to restrictions in the deed from Tennessee Land Company to Elizabeth T. Cartwright.

On 6 April 1971, the United States Steel Corporation executed a document entitled a "Correction Agreement," setting forth that the document of 30 December 1970, wherein it released its right to waive, modify, annul or enforce the restrictions relative to the lots in Warwick Manors, was mistakenly drawn and its effect was to freeze the restrictions and limitations in the deeds to the Warwick Manors lots, whereas in fact the United States Steel Corporation was attempting to grant permission to the owners of lots 1, 2, 3, 4, 5, 6, and 8 to build thereon the type of residential structure known as a "condominium."

As before stated, Dr. Callahan having become the owner of lots 2, 3, 4, 5, and 6 in Warwick Manors, made known that he intended to build a ten story condominium on said lots, or parts thereof.

The Weilands thereupon filed a declaratory action to determine the operative effect of the restrictions in the Warwick Manors' deeds, and also petitioned therein for an injunction to prohibit Dr. Callahan from proceeding with his proposed erection of the condominium building.

The respondent, Dr. Callahan, filed a cross bill and answer.

After a hearing, the Chancellor decreed that the restrictions set forth in the deeds to lots 2, 3, 4, 5, and 6 are valid and enforcible, and meant that only one single dwelling house could be created on any one lot.

It was further decreed that Dr. Callahan, his agents, architects, engineers, contractors, and attorneys be permanently enjoined from engaging in any activity related to the construction of any building in violation of the restrictions set forth in the deeds to the lots.

From this decree the respondent Callahan perfected this appeal.

■ Appellant contends that the restrictions imposed in the deeds by the Tennessee Land Company were reserved solely for the benefit of the company, and therefore cannot be deemed to be covenants running with the lots sold by the company nor appendant to such lots. Particularly is this true, says the appellant, in view of the provision that the Tennessee Land Company reserved the right at any time to

change, modify, and/or annul the restrictions.

Disregarding for the moment the provision that the Tennessee Land Company reserved the right to alter, change, and annul the restrictions imposed on the purchasers of the lots in Warwick Manors, it would appear that the restrictions would naturally tend to enhance the value of all of the lots in the subdivision. It was the apparent intention of the Land Company to develop a highly desirable subdivision on the top of Red Mountain. The restrictions would be appealing to prospective purchasers and would tend to enhance the value of the unsold plots yet in possession of the Land Company. The restrictions may therefore be fairly said to touch and concern the land, and be beneficial to the owners of the lots, whoever they might be, and therefore appendent to the lots. McMahon v. Williams, 79 Ala. 288; Webb v. Jones, 163 Ala. 637, 50 So. 887; Allen v. Axford, 285 Ala. 251, 231 So.2d 122.

Further, as stated in Allen v. Axford, supra:

"It is also firmly established by our decisions that where the owner of a tract of land adopts a general scheme for its development, divides it into lots, and conveys the lots with restrictions as to use, such restrictions create equitable easements in favor of the owners of the several lots which may be enforced in equity by any one of such owners. Hall v. Gulledge, 274 Ala. 105, 145 So.2d 794; Pugh v. Whittle, 240 Ala. 503, 199 So. 851; Scheuer v. Britt, 218 Ala. 270, 118 So. 658; McMahon v. Williams, 79 Ala. 288."

As to the effect of reservation of Tennessee Land Company to alter or annul the restrictions imposed in its deeds conveying the lots in Warwick Manors, we quote the following governing principle established in Hall v. Gulledge, 274 Ala. 105, 145 So. 2d 794:

"Appellees contend that the reservation by the grantor of the right to change or modify the restrictions as to any lot in Redmont Park negates any intention to benefit the lands of other owners. We cannot agree with this contention. To do so would be to construe this language as indicative of his intention to the exclusion of all other language in the deed and all surrounding circumstances. We have in the past given effect to restrictions contained in deeds at the instance of grantees of lots in subdivisions where the grantor had expressly reserved the right to waive, release or annul the restrictions contained in the plot and conveyance. Thrasher v. Bear, 239 Ala. 438, 195 So. 441. It seems to us that the power to change the restrictions is only one factor to be considered in determining the intention of the grantor to give the right of enforcement of the restrictions. All language of the deed should be considered in arriving at the grantor's intention. We believe when all the language of the deed under consideration is considered, it is apparent that these complainants (appellants) have a standing to bring this action. * * *"

Likewise in this case, upon a consideration of all the language in the deeds, it is reasonable to conclude that the Chancellor did not err in decreeing that it was the intention of the grantor to give to its vendees the right of enforcement of the restrictions.

■ Appellant contends that the covenants and restrictions are unenforcible because they are vague and ambiguous, in that the restriction as to a single dwelling house on a single lot is confused by the later restriction as to servants' houses, stables, garages, and other buildings apparently permitted after completion of the main dwelling house, and also that the restriction as to apartment houses, double or duplex houses, etc., is limited to apartment houses, etc., selling food.

We find no ambiguity or confusion in the restrictions above mentioned. The permis-

sion as to having servants' houses, stables, garages, and other buildings on each lot merely pertains to buildings necessary to and supportive of the single main or capital house permitted on each lot.

It also appears clear that the phrase "or place of any sort for the serving of food or refreshments to the public" is only an additional restriction as to the use of the lot and in no manner is related to or modifying of the other restrictive uses, i. e., apartment house, double or duplex house, inn, etc.

It is our opinion that a tortured construction of the language employed in setting up the restrictions, and the intent of the parties evidenced thereby, would have to be resorted to if accord be given to the above contentions of the appellant.

■ Appellant further contends that the restriction as to placing an apartment house on the lot should not be deemed to apply to a condominium since condominiums were unknown in this state at the time restrictions were written, and restrictions against free use of property are not favored in law and are to be strictly construed. See Bear v. Bernstein, 251 Ala. 230, 36 So.2d 483; Springdale Gayfer's Store Co. v. Holmes, 281 Ala. 267, 201 So. 2d 855. It is appellant's contention that a condominium is but a single residence. With this we disagree.

While the form of ownership represented by one purchasing a unit in a condominium has been long known in Europe, such ownership is a fairly recent development in this country.

It was first recognized in Alabama by Act No. 206, approved 1 September 1964, which provides in its first section that the Act is to be known as Apartment Ownership Act. For convenience this Act may be found as Secs. 286 through 313 of Title 47, Recompiled Code of Alabama, 1971 Cumulative Pocket Part.

In Sec. 1.01 of their work "Condominium Law and Practice," Rohan and Reskin set forth that:

"The term 'Condominium' may be defined generally as a system of separate ownership of individual units in mutiunit projects."

Ordinarily a condominium consists of a number of units or apartments in a single structure. Section 289 of our Apartment Ownership Act, mentioned above, provides that:

"Each apartment, [in a condominium] together with its undivided interest in the common areas and facilities, shall for all purposes constitute real property."

Two enlightening articles concerning the condominium concept of ownership may be found in the January 1973 issue of The Alabama Lawyer, Vol. 34. These are "Castle in the Air," by Albert J. Tully, and "Some Aspects of Condominium Development," by Thomas G. Mancuso.

These two articles as well as other writings on the subject, show that one purchasing a condominium unit acquires two types of ownership. First, he becomes sole owner of the entire area constitutiong the unit purchased. Secondly, he becomes co-owner or tenant in common of a percentage of the common elements and areas of the. condominium. There common elements are such things as supporting (but not interior) walls, the roof and foundation of the building in which his unit is located, the general wires and pipes in the building, walks, streets, the land area or tract in which the condominium is placed, and such things as a swimming pool or clubhouse if erected on the condominium property.

The declaration filed in connection with setting up and establishing a condominium fixes the percentage of ownership in the general elements of the condominium property acquired by virtue of owning a unit in the condominium. The declaration also fixes the percentage of voting rights of

each unit owner, and the percentage of expenses the unit owner must bear in the common expenses of maintaining the condominium.

The restrictions limiting the use of each lot to a single dwelling house with necessary outbuildings, with the additional expressed intent that no apartment house, double or duplex, inn, or boarding house could be maintained on any lot, evinces a clear intent of the parties to prevent an overdensity of population in the subdivision, and to maintain the subdivision as a highly desirable residential subdivision.

Any multi-unit dwelling building would be contrary to this intent whether it be called an apartment or a condominium.

One distinction between the two in this aspect is that the usual apartment building and area is owned by a single person who rents the apartments or units in the building, whereas in a condominium the apartments or units are owned by the individuals, who also own a percentage of the common elements of the condomium. The population congestion is the same in either case.

Our Apartment Ownership Act which permits the establishment of condominiums speaks throughout of "apartment," "apartment owner," "association of apartment owners," etc.

In Webster's Third International Dictionary, "apartment building" or "apartment house" is defined as, "A building containing a number of separate residential units and usu. having conveniences (as heat and elevators) in common."

We hold that a condominium is within the scope and meaning of the word "apartment house" as it appears in the restrictive provision prohibiting the erection of an apartment house on the lots here involved.

Counsel for appellant contends that paragraph (1) of the restrictions limiting the use of the property to white persons only is the primary covenant in the restriction provisions, and that all the remaining covenants are subordinate thereto. Thus, argues counsel, all the restrictions are void. Counsel cites no authority in support of this contention.

The racially restrictive covenant bears no relation to the remaining covenants, and is entirely distinct from the building and use restrictions. Although the racially restrictive covenant is unenforcible since Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, we see no reason why it should not be separable from the remaining enforcible covenants, which separation would in nowise affect the validity of the remaining covenants. At least two of our sister state courts have so held, and we are in accord with such holdings. See Brideau v. Grissom, 369 Mich. 661, 120 N.W.2d 829; Goodstein v. Huffman (Tex.Civ.App.), 222 S.W.2d 259.

Appellant argues that the power reserved by the Tennessee Land Company, coupled with the document of 30 December 1970, as said document was corrected by the instrument of 6 April 1971, resulted in a permission to Dr. Callahan to erect a condominium on his property.

The fallacy of this argument is that the effect of the 30 December 1970 instrument, which was recorded on 7 January 1971, was to reaffirm the restrictions, if such reaffirmance was in anywise necessary, in clear and unambiguous language.

The appellees purchased their lot on 15 March 1971.

Mr. Weiland testified that a copy of the deed from the Tennessee Land Company conveying to Elizabeth T. Cartwright the property he later purchased, as well as the instrument of 30 December 1970, whereby the United States Steel Corporation, as successor to the Tennessee Land Company, relinquished its right to waive, modify, or annul the restrictions contained in the deeds theretofore conveying lots in War-

wick Manors, were both in his hands. He was aware of the contents of the documents and of the covenants and restrictions governing lots in Warwick Manors, and thereafter purchased his lot in reliance thereon.

The Weilands therefore must be deemed to have acquired their lots with all rights attached thereto as of the date of their deed.

Clearly, the action of the United States Steel Corporation as evidenced by the so-called "Corrective Agreement" of 6 April 1971, cannot be permitted to affect the rights previously acquired by the Weilands. This "Corrective Agreement" executed many years after the vendor had parted with title to the lots in Warwick Manors cannot be deemed of any legal effect. Allen v. Axford, supra; Virgin v. Garrett, 233 Ala. 34, 169 So. 711; Scheuer v. Britt, 218 Ala. 270, 118 So. 658.

Appellant's assignment of error 1 asserts that the trial court erred in sustaining complainant's (appellee's) demurrer to respondent's (appellant's) cross bill, while assignment of error 2 and 3 assert the same error on the basis that no answer to the cross bill was filed and issue had not been joined.

It appears from the record that at the time of trial of the present case there was also pending another case styled Henry J. Weiland et al. v. Alston M. Callahan, being Case No. 168-545, in the Circuit Court of Jefferson County, in Equity. The second case involved the validity of a zoning ordinance of the City of Birmingham which rezoned the appellant's lots to permit the construction of condominiums thereon by the appellant.

On 2 February 1972 the appellant herein filed a motion to consolidate this case with the zoning ordinance case. On 22 February 1972, the Chancellor denied the motion to consolidate.

However, the record reflects that it was agreed in open court during the hearing that the present case (concerning the covenants and restrictions) and the zoning case would be tried seriatim, and that the testimony taken would be applicable in both cases.

Two bases were set forth in the cross bill as supportive thereof:

1. The effect of the zoning order permitting the erection of condominiums on appellant's lots, and

2. The "Corrective Agreement" executed by the United States Steel Corporation attempting to permit the erection of condominiums on the appellant's lots.

We note immediately that as to basis No. 2, this same proposition was set forth in appellant's answer and was made an issue during the trial. Appellant therefore could not have suffered any probable injury to any substantial right because of the sustention of the demurrer under this aspect of the cross bill.

As to the matter of the rezoning of appellant's property, mentioned in paragraph 1 above, the record shows that at the start of the hearing of this case involving the covenants, James Arthur Wright was called out on order and examined by an attorney for the appellant. Mr. Wright is a City Planner for the City of Birmingham. He testified fully as to the procedure and hearings, which culminated in the passage of an ordinance by the governing body of the City of Birmingham rezoning appellant's (Dr. Callahan's) lots to permit the erection of a condominium thereon.

The effect of the order sustaining the demurrer to the cross bill was to eliminate it until the appellant filed an amendment thereto. Savage v. Savage, 246 Ala. 389, 20 So.2d 784; Comer v. Limbaugh, 256 Ala. 655, 57 So.2d 72. Even so, evidence was received going to the very aspect of the cross bill seeking to inject the rezoning ordinance into the issues. No amendment, however, was made to the cross bill in the light of this evidence.

■■ Nor do we see that any effective amendment to the cross bill seeking to set up that aspect of the cross bill relating to the rezoning ordinance could have been made. This for the reason that a contract creating a covenant running with land cannot be impaired by a law enacted by the state, nor by a municipality which is a creature of the state. Allen v. Axford, supra; Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 17 U.S. 518, 4 L.Ed. 629; Article 1, Sec. 10, Constitution of the United States; Article 1, Sec. 21, Constitution of Alabama 1901. We hold that the appellant suffered no probable injury to any of his substantial rights because of the sustaining of the demurrer to the cross bill in the aspect asserting the rezoning ordinance permitting the building of a condominium on appellant's lots.

Finally, appellant's assignment of error 8 reads:

"The trial court erred in that it overruled a motion to consolidate the instant case with case No. 169–899 [rezoning ordinance case] and then proceeded notwithstanding its order overruling such motion to consolidate to try the instant case together with case No. 169–899 simultaneously, to the prejudice of the appellant."

■■ Ordinarily the matter of consolidation of causes is within the judicial discretion of the trial court. Ex parte Ashton, 231 Ala. 497, 165 So. 773. We find no abuse of this discretion in this case.

Counsel for appellant argues, however, that after denying appellant's motion for consolidation, the court proceeded to try the cases together.

Except for the witness, James Arthur Wright, who was taken out of turn and whose testimony related solely to the rezoning case, the evidence in the rezoning case was not taken until the completion of the evidence in the present case, that is, the covenant case. It is to be noted that in his motion to consolidate the appellant asserted that the sole issue involved in each case was whether the appellant could construct a condominium on his described lots, and that the purpose of bringing two suits was to hinder, delay, and obstruct such use of the lots, and that the result of not consolidating the two cases would result in vexatious and costly delay.

■■ It would appear that the procedure followed by the Chancellor was with the full concurrence and acquiescence of the appellant. Certainly the appellant interposed no objection during the proceeding below to the procedure followed. Matters not objected to in the trial below cannot be raised for the first time on appeal. Hoefer v. Snellgrove, 288 Ala. 407, 261 So.2d 431.

Nor is this matter within the influence of Bateh v. Brown, 289 Ala. 695, 271 So.2d 830, as argued by the appellant.

In the present case the decree sustaining the demurrer to the cross bill was entirely separate and apart from the final decree rendered. Each, however, was rendered in the present case, and not in the rezoning suit. In Bateh, supra, a single decree was rendered deciding the issues in two separate and distinct cases without any order consolidating the two cases.

Affirmed.

HEFLIN, C. J., and MERRILL, COLEMAN and FAULKNER, JJ., concur.