MOORE, Judge.
On March 6, 2009, the Bessemer Division of the Jefferson Circuit Court (“the trial court”) entered a judgment in favor of Charles Juliano and his wife, Carolyn Juli-ano, in a civil action arising out of a dispute regarding a series of steps constructed by the Julianos in a common area in the Willow Lake Subdivision (“the subdivision”). In that judgment, the trial court enjoined the Willow Lake Residential Association, Inc. (“the Association”), from removing the steps from the common area; awarded Charles Juliano $20,000 in damages recoverable against the Association and its codefendants, Craig Harrington, *231 Steve Van Gilder, Curtis Guenther, Kathleen Zavatti, and Rental Managers, Inc.; and ordered the assets of the Association to be placed into receivership. From that judgment, the Association and its codefen-dants appeal.[1]

Facts and Procedural Background

The dispute between the parties began after the Julianos cleared an overgrown area of land immediately behind their recently purchased home in the subdivision and erected a series of steps leading from their property to the edge of Tom Sawyer Lake. Charles Juliano testified that, when he and his wife purchased their property, certain statements made by the prior homeowner led Juliano to believe that the Julianos would own the land leading from their home to the lake. However, both the description of the property in the deed transferring the property to the Julianos and a survey provided to the Julianos at the closing of the loan to purchase the property showed indisputably that the Ju-lianos’ property line ended well above the edge of Tom Sawyer Lake. As a result, it is undisputed that a majority of the steps were built on a common area bordering the lake.
The Julianos eventually received a letter from Kathleen Zavatti, an employee of Rental Managers, Inc., informing them that she was managing the common areas of the subdivision on behalf of the Association and that the Association maintained that the construction of the steps violated certain restrictive covenants applicable to the subdivision. Charles Juliano testified that, despite certain references in the Ju-lianos’ deed and in other documents presented to the Julianos at the closing of the loan to purchase the property, he did not realize that any restrictive covenants would apply to the Julianos’ use of the common areas in the subdivision or that any violations of those restrictive covenants could be enforced by a homeowners’ association. When the Julianos received Zavatti’s letter, Charles Juliano met with her to discuss the matter. Following that meeting, and after obtaining a survey of the subject property, Zavatti sent the Ju-lianos another letter giving them the option of either purchasing the common area, with the consent of the abutting landowners, or removing the steps. The Julianos did not agree to either option;[2] instead, Charles Juliano, believing that the Association was threatening to take part of the Julianos’ property, retained an attorney, who demanded by correspondence that Za-vatti and the Association cease harassing the Julianos.
On July 31, 2006, Charles Juliano filed a civil action against the Association and its codefendants, three of whom — Harrington, Van Gilder, and Guenther — in 2005 and 2006, acted as members of the board of directors of the Association and one of whom — Zavatti—in late 2005 and 2006, acted as the property manager for the subdivision through her employer, Rental Managers, Inc. In count one of his complaint, Juliano requested that the trial court permanently enjoin the Association from taking any action to remove the steps or to damage the Julianos’ property or the area immediately behind the Julianos’ property. In count two, Juliano asserted that the Association had never been properly incorporated, that its board of di *232 rectors had never been properly appointed, that the board of directors had not followed certain corporate formalities, and that the board of directors had improperly collected homeowners’ dues based on the misrepresentation that the Association was acting as an incorporated association. Ju-liano sought to enjoin “the defendants” from taking any further action with regard to the assets of the Association and requested that the trial court appoint a receiver to assume control of the assets of the Association or to properly incorporate the Association. In count three, Juliano asked the trial court to declare the restrictive covenants, bylaws, and articles of incorporation of the Association to be void. In addition, in other counts of his complaint, Juliano asserted claims of unjust enrichment and quantum meruit, and he sought damages against the Association and its codefendants for trespass, slander, and fraud.
Based on the allegations in the complaint, counsel retained to defend the lawsuit investigated the history of the Association and discovered that the Association had never been properly incorporated. On August 22, 2006, the Association filed articles of incorporation in the Bessemer Division of the Jefferson Probate Court, which articles were purportedly corrected or amended on August 24, 2006. A little over a month after the articles of incorporation were filed, the Association filed an answer to Charles Juliano’s complaint and a counterclaim in which Carolyn Juliano was named as a counterclaim defendant, seeking a declaration that the Julianos had erected the steps in violation of certain restrictive covenants; that the Association had the right to enforce the restrictive covenants against the Julianos and to remove the steps from the common area; and that the Association had the right, pursuant to certain restrictive covenants, to recover costs and attorney’s fees incurred by it in enforcing the restrictive covenants. The codefendants also answered Juliano’s complaint. The case proceeded to trial on November 17, 2008, during which the tidal court allowed Juliano to amend his complaint to further allege that the defendants had interfered with his right to use and enjoy the common area. The trial court entered a judgment favorable to the Julianos on March 6, 2009. The trial court subsequently denied the Association’s and its codefendants’ post-judgment motions.

Incorporation and other Related Issues

In its judgment, the trial court found that in 1995 the Willow Lake Partnership (“the partnership”) filed in the Bessemer Division of the Jefferson Probate Court a document entitled “Willow Lake Residential Declaration of Covenants, Conditions, and Restrictions.” That document contemplated the formation of a nonprofit corporation to be designated as “Willow Lake Residential Association, Inc.” The partnership attached articles of incorporation and bylaws for the Association to the declaration, but, the parties agree, the filing of those attachments did not comply with the statute regarding the method for proper incorporation, see Ala.Code 1975, § 10-3A-60, so the Association was not, at that time, properly incorporated.
The record shows that the partnership managed and operated the unincorporated Association from 1995 through late 1999, at which time it notified the homeowners in the subdivision that it would be turning over the management of the Association to them. A small group of homeowners, representing far less than one-half of all the homeowners in the subdivision, formed a transition committee and elected nine directors that then assumed control of the Association. It is undisputed that the election did not comply with the bylaws *233 filed by the partnership, which called for only three directors who were to be appointed by the partnership or elected by a majority of the homeowners. Thereafter, the Association failed to hold annual meetings attended by a quorum of the homeowners in the subdivision, as required by the bylaws. The bylaws provided the board of directors authority to appoint an Architectural Review Committee (“ARC”). The trial court found that, because the board of directors had not been properly formed, the board never properly appointed an ARC.
In early 2005, the acting board of directors discovered that the Association was not listed as a corporation on the Web site for the Alabama Secretary of State. After several board members investigated the matter, the board decided not to take any action to incorporate, a decision reflected in the minutes of a meeting of the board, which read as follows: “We meet all the qualifications for an Association and we do not need to be incorporated.”
Following service of Juliano’s complaint, the board retained an attorney, who discovered the 1995 filing error. The attorney arranged for the filing of articles of incorporation on August 22, 2006. Those articles incorrectly identified Zavatti as a board member and contained several typographical errors. On August 24, 2006, the attorney attempted to correct those errors by filing amended articles of incorporation. The trial court found that the August 24 filing did not comply with “the requirement for filing Amended Articles of Incorporation. See Ala.Code 1975, § 10-3A-81.” For that reason, the trial court found that the Association had again failed to incorporate.
On January 8, 2007, a quorum of the homeowners in the subdivision met for the purpose of ratifying the acts performed on behalf of the Association for the preceding seven years. The homeowners voted 77 to 68 for ratification. In its judgment, the trial court considered that vote a nullity because the Association was not incorporated at the time.
The trial court declared in its judgment that the Association had never formally incorporated and that the Association had not acted as a de facto corporation. The court concluded that the moneys collected by the Association had been intended for a nonprofit corporation that had never been created. The trial court therefore appointed a receiver to collect the assets of the Association until the homeowners in the subdivision validly formed a corporation “in accordance with Alabama law and Ala. Code 1975, § 10-3A-81,” at which point the receiver would transfer the assets to that corporation. The trial court further concluded that, because the Association had not been properly incorporated, a 2000 deed of the common areas of the subdivision from the partnership to “Willow Lake Residential Association, Inc.,” did not pass title to that land to the Association. Additionally, the trial court determined that the Association, as an unincorporated entity with no ownership rights to the common areas, had no standing to enforce the restrictive covenants.
The Association argues that, for several reasons, the trial court erred in concluding that the Association was not acting as a corporate entity. However, we need only address the Association’s argument regarding its formal incorporation.
The evidence in the record, which consists of exhibits and testimony admitted at a hearing on the Association’s motion for a preliminary injunction and exhibits and testimony admitted during the November 2008 trial, see Rule 65(a)(2), Ala. R. Civ. P. (providing for automatic incorporation of admissible evidence from pre *234 liminary-injunction hearing into record of trial on the merits of petition for permanent injunction), shows indisputably that the Association filed its articles of incorporation on August 22, 2006. The trial court made no finding that the filing of the August 22, 2006, articles of incorporation was irregular in any way, and we have not identified any impropriety with regard to that filing that would prevent the incorporation of the Association. Each homeowner who bought a home in the subdivision consented to become members of the Association as a nonprofit corporation and further agreed, pursuant to Section 12.18 of the restrictive covenants, to
“otherwise do or make, or cause to be done and made, any and all agreements, ... acts or things ... which may be reasonably requested by the Association ... for purposes of or in connection with clarifying, amending or otherwise consummating any of the transactions and matters herein.”
The homeowners thus consented to the filing of the articles of incorporation on August 22, 2006. Hence, the only legal conclusion to be drawn is that the Association properly incorporated on August 22, 2006. See Ala.Code 1975, § 10-3A-63 (“Upon the filing of the articles of incorporation with the probate judge, the corporate existence shall begin.”).
The trial court concluded that the Association had not properly incorporated because it did not comply with Ala.Code 1975, § 10-3A-81, when it attempted to amend its articles of incorporation on August 24, 2006.[3] Section 10-3A-81 deals solely with the proper procedure for amending articles of incorporation; that section does not apply to the procedure for filing original articles of incorporation. Thus, any noncompliance with § 10-3A-81 would affect only the validity of the amendments to the articles of incorporation filed on August 24, 2006, and not the validity of the original articles of incorporation filed on August 22, 2006.[4] Therefore, the trial court erred when it concluded that the Association’s alleged failure to satisfy § 10-3A-81 rendered the August 22, 2006, articles of incorporation ineffective.
That error led the trial court to erroneously declare that the Association had not been properly formed as a nonprofit corporation; that its assets, which were being improperly held by an unincorporated association of homeowners, should be placed in the hands of a receiver; and that the *235 Association lacked standing to enforce the restrictive covenants.
We correct that first error by reversing the judgment of the trial court insofar as it determined that the Association had not properly incorporated and remanding the cause with an instruction for the trial court to revise its judgment to reflect that the Association had properly incorporated on August 22, 2006, and to deny Juliano’s request for a judgment declaring that the articles of incorporation and bylaws of the Association are void.
As for the second error, the record shows that the receiver managed the Association from March 2009 until the Association obtained a stay of the judgment on August 28, 2009. Following the entry of the stay, the receiver returned the assets of the Association to its acting board of directors, all of whom had been duly elected by a majority of the homeowners in the subdivision. The Association points out that it incurred fees payable to the receiver during his interim management, but the Association does not specifically argue that it is entitled to recover those fees. It argues solely that the judgment appointing the receiver should be reversed and that the assets of the Association should remain under the management of the board of directors. Because the issue remains viable, in that a failure to reverse the judgment as to this issue would enable the trial court to lift the stay and return the assets of the Association to the receiver, we reverse the judgment of the trial court as to this issue and remand the cause with instructions to vacate that portion of its judgment placing the assets of the Association into receivership.
The third error relates to the standing of the Association to enforce the restrictive covenants. “Standing, like jurisdiction, is necessary for any valid legal action.” Doremus v. Business Council of Alabama Workers’ Comp. Self-Insurers Fund, 686 So.2d 252, 253 (Ala.1996) (emphasis added). A person or entity must have standing in order “[t]o be a proper party” to a lawsuit. Id. A person or entity has standing to assert a claim if that person or entity has a real, tangible legal interest in the subject matter of the lawsuit as evidenced by an injury in fact to a legally protected right. State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1027-28 (Ala.1999). The trial court reasoned that the Association did not have standing to enforce the restrictive covenants because the restrictive covenants place that power in the Association as a nonprofit corporation. See generally Bon Aventure, L.L.C. v. Craig Dyas, L.L.C., 3 So.3d 859, 863-64 (Ala.2008) (recognizing that standing may be based on language of restrictive covenants granting right to enforce covenants by filing suit). However, the Association formally became a nonprofit corporation on August 22, 2006.[5] At that point, the Association assumed all the *236 enforcement powers contained in the restrictive covenants. Before that date, the Association had not taken any legal action to enforce the restrictive covenants. The Association’s first legal action to enforce the restrictive covenants occurred in October 2006, when it filed its counterclaim. Because the Association had assumed its enforcement powers by that time, it had standing to enforce the restrictive covenants. See Town of Elmore v. Town of Coosada, 957 So.2d 1096, 1102 (Ala.2006) (holding that standing is determined as of the date of the filing of counterclaim first asserting legal right). We therefore reverse the judgment of the trial court insofar as it determined that the Association lacked standing to enforce the restrictive covenants, and we remand the cause with instructions that the trial court vacate that portion of its judgment concluding that the Association lacked standing.[6]
The Association also asserts on appeal that this court should reverse the judgment of the trial court insofar as it declared that the Association never acquired ownership of the common areas pursuant to the 2000 deed from the partnership. We note that the parties litigated the issue of ownership of the common areas solely for the purpose of proving whether the Association had standing to enforce the restrictive covenants. Had the trial court properly ruled that the Association had standing based on its August 22, 2006, incorporation, it would have had no need to address the ownership issue. Thus, our reversal of the judgment in regard to the incorporation issue renders the findings of the trial court on the ownership issue to be gratis dictum. See Planters’ & Merchants’ Bank of Mobile v. Walker, 7 Ala. 926, 944 (1845) (“ ‘An opinion given in Court’ ..., ‘if not necessary to the judgment given of record, ... is no judicial opinion, no more than a gratis dictum.’ ” (quoting Ram on Legal Judgment, p. 37)). Although gratis dictum is of no legal force and effect, see Ex parte Smallwood, 811 So.2d 537 (Ala.2001), and although the trial court’s judgment holding that the Association does not own the common areas is not binding, in order to avoid any misapplication of the language in the judgment, we believe the appropriate remedy is to reverse the judgment as to this issue and to remand the cause with instructions for the trial court to vacate that portion of its judgment relating to the ownership of the common areas.

Violation of Restrictive Covenants

In its judgment, the trial court concluded that the “steps do not violate any restriction in the Covenants.” The Association argues that the trial court clearly erred in reaching that conclusion because, it says, the Julianos constructed the steps in a common area specifically intended to be a buffer zone, which construction breached the plain language of several restrictive covenants.
The section of the restrictive covenants most applicable to the steps is § 3.05.[7] Section 3.05, in part, specifically grants to “the Developer, the ARC, the Association and their respective ... representatives *237 ... [the right] to access the Common Areas for the purpose of ... (ii) installing, maintaining, repairing and replacing any other Improvements to the Property or to the Common Areas and (iii) doing all other things reasonably necessary and proper in connection therewith.”
 Restrictive covenants are to be construed according to the intent of the parties in light of the terms of the restriction and circumstances known to the parties. Hines v. Heisler, 439 So.2d 4, 5-6 (Ala.1983). If “there is no inconsistency or ambiguity within a restrictive covenant, the clear and plain language of the covenant is enforceable by injunctive relief.” Carpenter v. Davis, 688 So.2d 256, 258 (Ala.1997). The plain language of the foregoing restrictive covenant grants only to the developer, the ARC, and the Association the right to install improvements on common areas. Section 3.05 does not authorize any individual homeowner to unilaterally construct an improvement on a common area.
The term “improvement” is defined in § 1.16 of the restrictive covenants as “any building, structure or device constructed, erected, or placed upon any Lot or Common Area which in any way affects the exterior appearance of any Lot, Dwelling, or Common Area.” It cannot be disputed that the steps constitute an improvement within the meaning of § 1.16. The evidence shows without dispute that a majority of the steps extend into the common area surrounding Tom Sawyer Lake. Charles Juliano admitted that he had the steps built without the approval of the Association. From that undisputed evidence, it is clear that the construction of the steps violated § 3.05 of the restrictive covenants. The trial court erred in finding otherwise.

The Waiver Issue

In its judgment, the trial court also found that “the enforcement of the Covenants has been waived.” Although the trial court did not specify its reasons for concluding that the Association had waived the enforcement of the restrictive covenants, in its findings of fact the court noted that the Association had failed to deliver a copy of the restrictive covenants to the Julianos when the Julianos first moved into the subdivision, that other structures had been allowed to stand around the lake, and that no one had informed the Julianos of the violation during construction of the steps despite the open and obvious nature of the construction.
The evidence shows that the Association’s residential-management company ordinarily provided the restrictive covenants to new homeowners as part of an introductory package. However, due to a change in the residential management occurring around the time the Julianos purchased their property, no restrictive covenants were delivered to the Julianos.
Regardless of the failure of the Association to fulfill its self-imposed custom of delivering an actual copy of the restrictive covenants to new homeowners in the subdivision, the Julianos were charged by law with notice of the contents of those covenants because the restrictive covenants were recorded in the appropriate probate court and were referenced in the Julianos’ deed. Pursuant to Ala.Code 1975, § 35-4-63, that recording “operates as notice of the contents of such conveyance or instrument .... ” In Ex parte Smokerise Homeowners Ass’n, 962 So.2d 793 (Ala.2007), our supreme court held that a homeowner who purchases a lot in a subdivision burdened by properly recorded restrictive covenants is charged with knowledge of those covenants. See also Callahan v. Weiland, 291 Ala. 183, 279 So.2d 451 (1973) *238 (purchaser who had in his hand the deeds reflecting existence of restrictive covenants was deemed to know, and agree to, covenants). Thus, the Association could not have waived compliance with the restrictive covenants by failing to deliver a copy of those covenants to the Julianos before the construction of the steps.
For much the same reason, the Association could not have waived compliance with the restrictive covenants by failing to notify the Julianos of the violation during construction of the steps.[8] The Julianos had already been given constructive notice of the violation due to the operation of § 35-4-63; any additional actual notice would have been only cumulative in nature.
The evidence in the record shows that certain structures were allowed to stand within the common area surrounding the lake and that one homeowner had laid steps to the edge of Tom Sawyer Lake. Those bare facts do not establish that the Association waived the right to enforce the restrictive covenants against the Julianos, however. Section 12.19 of the restrictive covenants specifically states: “The failure to enforce any covenant or restriction set forth herein shall in no event be deemed a waiver of the right hereafter to enforce such covenant or restriction.” That language coincides with general Alabama law that the acquiescence of a homeowners’ association as to one violation of a restrictive covenant does not act as a waiver as to other or future violations. See Dauphin Island Prop. Owners Ass’n v. Kuppersmith, 371 So.2d 31 (Ala.1979); and Morrison v. Boutwell, 717 So.2d 427 (Ala.Civ.App.1998). Thus, assuming that the Julia-nos proved that the Association had allowed prior violations of the restrictive covenants based on the evidence above, that proof did not establish that the Association had waived its right to enforce the restrictive covenants against the Julianos. The trial court erred in finding that the Association had waived compliance with the restrictive covenants.

The Benefit Issue

In its judgment, the trial court found that the construction of the steps actually enhanced the value of the subdivision property and that the steps were contemplated in the developer’s general scheme of development. As to the latter finding, no evidence in the record sustains the conclusion that the partnership intended for steps to be laid in the common area immediately behind the Julianos’ property line. The evidence shows that the partnership granted access to the lake to all the homeowners through a relatively level recreational area at the opposite, more shallow, end of the lake. The Julianos, in direct violation of the developer’s restrictive covenants preventing the construction of other improvements around the lake, constructed the steps on a steep decline, basically accessible only to them and their immediate neighbors, which led into the deep end of the lake, which was bottomed with sharp and uneven rocks. The finding that the construction of the steps complied with the developer’s general scheme of development is clearly erroneous.[9]
*239 As to the former finding — that the construction of the steps actually enhanced the value of the subdivision — the record contains no competent evidence as to the effect of the construction of the steps on the value of the subdivision property. The Association maintained throughout the proceedings that any violation of a restrictive covenant, if allowed over its objection, necessarily dilutes the power of the restrictive covenants and thereby lessens the value of the subdivision property. We agree. In creating the restrictive covenants, the partnership expressly declared that the purpose of the covenants was “to protect the value and desirability of the Property.” Any unauthorized violation of the restrictive covenants would run counter to that purpose and would be classified as “irreparable harm” as a matter of law. See Tubbs v. Brandon, 374 So.2d 1358, 1361 (Ala.1979). Thus, the steps, if allowed to stand in violation of the restrictive covenants, decrease the value of the subdivision property.
Moreover, we conclude that it is immaterial whether the construction of the steps actually increased the value of the subdivision property. ‘When a restrictive covenant is broken, [our supreme court] has stated that an injunction should be issued because the mere breach of the covenant is a sufficient basis for interference by injunction. The right to enjoin such a breach will not depend upon whether the covenantee will be damaged by the breach.” Tubbs v. Brandon, 374 So.2d at 1361 (citing Reetz v. Ellis, 279 Ala. 453, 186 So.2d 915 (1966)). As explained by our supreme court,
“the reasons for this rule are stated to be that the owner of land, when selling to another, may insist on such covenants as he pleases touching its use and has the right to define the injury for himself; and that, when the covenant is broken, an injunction should issue because, from the very nature of the case, the remedy at law is inadequate.”
Reetz, 279 Ala. at 460, 186 So.2d at 921. The trial court’s reasoning would imper-missibly allow individual homeowners to violate restrictive covenants if those homeowners were subjectively convinced that the violation would improve the value of the subdivision property. That reasoning directly contradicts the law that “a party to a covenant is entitled to seek its enforcement even if the ... breach does not negatively impact the value of his property.” Viking Props., Inc. v. Holm, 155 Wash.2d 112, 121 n. 4, 118 P.3d 322, 327 n. 4 (2005). Therefore, the trial court erred in determining that the steps enhanced the value of the subdivision property and in denying the Association relief on that basis.

The Association’s Request for Declaratory Relief

Based on the foregoing considerations, the trial court should have granted the request for declaratory relief asserted by the Association. The trial court should have declared that the Julianos had agreed *240 to abide by the restrictive covenants when purchasing their property; that the Julia-nos had no right to alter or construct an improvement upon a common area in the subdivision; that the Julianos violated § 3.05 of the restrictive covenants by constructing the steps on the common area leading from their property to Tom Sawyer Lake; and that the Association possessed the authority to require the Julia-nos to remove the steps. We therefore reverse the judgment entered by the trial court to the extent it denied the above requested relief,[10] and we remand the cause with instructions that the trial court enter a new judgment in accordance with this opinion. Pursuant to these instructions, the trial court necessarily must vacate that part of its judgment granting the Julianos a permanent injunction against the Association preventing removal of the steps.[11]

The Attorney’s Fee and Costs Issue

In its counterclaim, the Association sought a declaration that “the Association is entitled to all costs, fees and expenses incurred in enforcing the terms of the Covenants, including, but not limited to, court costs, attorneys’ fees, interest and expenses arising from the removal of the concrete steps from the Julianos’ Property and the Common Area.” The Association based its request on the terms of § 5.13 and § 12.02 of the restrictive covenants.[12] Section 5.13 provides, in pertinent part:
“All costs and expenses incurred by the ARC or the Association in enforcing any of the provisions of this Article V ... shall be paid by said Owner.”
Section 12.02 provides, in pertinent part:
“[I]n the event the ... Board [of the Association] ... undertake[s] any legal or equitable action which [the Board] deemfs] necessary to abate, enjoin, remove or extinguish any violation or breach of this Declaration, then all costs and expenses incurred by either of them, including, without limitation, attorneys’ fees and court costs, in enforcing any of the terms, provisions, covenants or conditions in this Declaration shall be paid for by the Owner against whom such action was initiated.”
In its judgment, the trial court denied all the declaratory relief requested by the Association, and, additionally, it found the amount of attorney’s fees submitted by the Association to be unreasonable, stating that “the [Association’s] claim for attorney’s fees is denied.”
On appeal, the Association first argues that it did not file a claim for costs or attorney’s fees in its counterclaim. We agree. The counterclaim seeks only a judgment declaring its entitlement to all *241 costs and attorney’s fees associated with enforcing the restrictive covenants and removing the steps, pursuant to §§ 5.13 and 12.02. The counterclaim does not request that the trial court actually adjudicate the amount of the costs and fees incurred by the Association in enforcing its rights and removing the steps. The counterclaim further does not ask the trial court to impose such costs and fees against the Julianos. However, during the trial itself, the Association called its attorney to testify as to the legal fees incurred by the Association in enforcing the restrictive covenants; the Association also introduced the bills submitted by its attorney to substantiate those fees. Thus, it appears that the Association actually tried the issue of the amount of attorney’s fees to which it was entitled to recover. The Association also presented evidence indicating that it would cost $2,000 to $6,000 to remove the steps. Thus, the trial court reasonably could have treated the issue of the amount of costs and attorney’s fees recoverable by the Association as being within the scope of the pleadings. See Rule 15, Ala. R. Civ. P. (stating that pleadings can be amended to conform to the evidence presented at trial).
The Association next argues that, assuming this court finds that the Association did claim that it was entitled to costs and attorney’s fees, the trial court erred in denying that claim. As for the costs, the trial court did not state any ground for denying that claim. However, the trial court granted the Julianos a permanent injunction allowing them to maintain the steps on the common area, so it apparently determined that no costs for enforcement or removal would ever be incurred. Because we have reversed the trial court’s ruling granting the Julianos a permanent injunction, we instruct the trial court on remand to consider the appropriate amount of costs the Association can recover for enforcing the restrictive covenants by removing the steps.
As for the attorney’s fees, the trial court totally denied the claim on the ground that the amount of the fees, proven to be around $70,000, were unreasonable in relation to the costs of removing the steps, $2,000 to $6,000. The Association argues that the plain language of §§ 5.13 and 12.02 entitles it to recover all attorney’s fees incurred in enforcing the restrictive covenants regardless of their reasonableness. The Association further argues that the trial court erred in measuring the reasonableness of the fees against the costs of removing the steps.
Although the restrictive covenants do not state that the Association is entitled to recover only “reasonable” attorney’s fees, Alabama law reads into every agreement allowing for the recovery of attorney’s fees a reasonableness limitation. See Alabama Educ. Ass’n v. Black, 752 So.2d 514, 519 (Ala.Civ.App.1999) (“In Alabama, where there is an agreement to pay an attorney fee and the agreement does not speak specifically to the reasonableness of the fee, a ‘reasonable’ fee will be inferred.”); see also Twickenham Station, Inc. v. Beddingfield, 404 So.2d 43 (Ala.1981); Selman v. Bryant, 261 Ala. 53, 72 So.2d 704 (1954); Hamilton v. Burgess, 233 Ala. 4, 170 So. 348 (1936); and McGhee v. Importers & Traders Nat’l Bank, 93 Ala. 192, 9 So. 734 (1891), overruled in part on other grounds by Noble v. Gilliam, 136 Ala. 618, 33 So. 861 (1903). Restrictive covenants are agreements among various landowners regarding the use and enjoyment of their land and they should be construed like any other contract. See generally Collins v. Rodgers, 938 So.2d 379, 385 n. 15 (Ala.2006). The Association has not cited any case holding that an attorney-fee provision in a restrictive cove *242 nant should be read differently than an attorney-fee provision in other contracts. Implying a reasonableness limitation in contracts assures that neither party can penalize the other by running up exorbitant attorney’s fees with knowledge that the other side will have to pay those fees. Black, 752 So.2d at 519. That consideration exists equally in the context of a dispute over a violation of restrictive covenants; therefore, we cannot discern any valid reason for deviating from the rule in this case. Hence, we conclude that the trial court did not commit any error by interpreting the restrictive covenants to allow recovery of only reasonable attorney’s fees incurred in enforcing the restrictive covenants.
We do agree, however, that the trial court erred in totally denying the Association’s claim for attorney’s fees on the ground of their unreasonableness in relation to the costs of removing the steps. Based on the language of the restrictive covenants, the trial court should have determined the reasonable amount of attorney’s fees incurred by the Association in enforcing the restrictive covenants against the Julianos. That amount is not dictated by the relationship between the costs of the removal of the steps and the amount of the fees billed by the Association’s attorney. In his complaint, Charles Juliano sought to avoid the restrictive covenants on the grounds that they were invalid or inapplicable, that the restrictive covenants had not been violated, that any violation had been waived, that any violation should be excused, and that the Association had no legal standing to enforce the restrictive covenants. In order to enforce the restrictive covenants, the Association had to incur attorney’s fees to overcome each one of those contentions. That those fees ultimately exceeded the costs of the removal of the steps does not render them per se unreasonable.
Although we agree with the Julia-nos that the costs for representing the Association on incorporation and ratification matters and for responding to the tort claims filed by Charles Juliano would not be considered costs incurred to enforce the restrictive covenants, all the other actions taken by the attorneys for the Association appear to have been directed toward enforcing the restrictive covenants. For those actions, the attorneys billed the Association the amounts represented in the invoices introduced at trial. The trial court was not bound to accept those amounts as reasonable, but it could not consider the costs of removing the steps to be the limit of reasonableness. Rather, in determining the reasonableness of the fees, the trial court should have considered the relevant factors originally set out in Peebles v. Miley, 439 So.2d 137 (Ala.1983), which include:
“(1) the nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances.”
Van Schaack v. AmSouth Bank, N.A., 530 So.2d 740, 749 (Ala.1988). Moreover, if after considering the appropriate factors, a trial court concludes that the billed attorney’s fees are unreasonable in amount, the *243 appropriate action is not to deny the claim altogether but to enter a judgment for a reasonable amount of attorney’s fees. See, e.g., Beal Bank, SSB v. Schilleci, 896 So.2d 395 (Ala.2004).
Because the trial court erred in measuring the reasonableness of the attorney’s fees against the costs of removing the steps, and because the trial court entirely denied the claim for attorney’s fees based on its finding that the fees were unreasonable in amount, we reverse the judgment as to this issue and instruct the trial court on remand to conduct further proceedings to determine the reasonable amount of attorney’s fees incurred by the Association in enforcing the restrictive covenants against the Julianos.[13]

The Unjust-Enrichment, Fraud, and Quantum Meruit Claims

In one count of his complaint, entitled “Unjust Enrichment,” Charles Juli-ano asserted as follows:
“33. Juliano has paid assessments and homeowner’s dues to the defendants on the representations that he was required to do so pursuant to the statements and representations of the defendants. In fact, Juliano has been threatened concerning his compliance with certain Covenants and has paid money to the defendants which should have never been paid. The Willow Lakes Residential Association, Inc. has never been created and/or has failed to follow the corporate formalities as is required by the Covenants, Articles of Incorporation, and Bylaws. Mr. Juliano is due to be refunded his payments.”
In another count of his complaint, entitled “Fraudulent Misrepresentation,” Juliano further averred:
“41. Juliano purchased lots and paid money to the defendants under the representation that the money was going to the Willow Lakes Residential Association, Inc., as stated in the Covenants. The defendants made the misrepresentations and/or conveyed the misrepresenting information to Juliano.
“42. In fact, the Willow Lakes Residential Association, Inc. has never been created and is not a proper corporation.
“43. Juliano relied upon the misrepresentations made by the defendants. Juliano was justified in relying upon the misrepresentations of the defendants.
“44. As a result of his reliance on the misrepresentations of the defendants, Mr. Juliano has been damaged.”
Based on those allegations, Juliano requested that the trial court award him compensatory and punitive damages. In its final judgment, the trial court awarded Juliano $20,000, based partially on his claims of unjust enrichment and fraudulent misrepresentation. On appeal, the Association and the codefendants argue that the trial court should have entered a judgment in their favor on the claims of unjust enrichment and fraudulent misrepresentation.[14]
The evidence shows that, when the Ju-lianos purchased their home in the subdivi *244 sion, they paid a pro rata share of the homeowners’ dues for the year 2005. Thereafter, from 2006 through 2008, the Julianos paid their annual homeowners’ dues in January of the respective years in response to an invoice submitted by the Association. Although the complaint alleges that Charles Juliano paid the dues in reliance on representations that the Association was a valid corporation, at trial he testified, upon questioning by his attorney, as follows:
“Q: Now, also did you pay homeowners dues to that association in January of 2006?
“A: Yes, I did.
“Q: Why did you pay that?
“A: Well, at the time I had already put the steps in, and I guess I just wanted to be a good neighbor and the help the community.
“Q: Did the Willow Lakes Residential Association represent to you that they were an incorporated entity?
“A: No.
“Q: Did you understand in January of 2006 after you installed the steps that Ms. Zavatti was claiming that they were an association?
“A: Yeah. She said it was an association.
“Q: And when Ms. Zavatti and the Association sent you the bills due, did you pay them because you felt like that they were an association?
“A: At the time — at that point in time, they had told me they were — you know, they had sent a letter by the Association. I paid it because I was living in the neighborhood.
“Q: Was it your understanding from what they said that you had to pay that dues?
“A: Because it had a late charge on there.
“Q: Was it your understanding that you were required as a homeowner in that neighborhood, based upon what Ms. Zavatti said, to pay those bills?
“A: Not really.”
Juliano later testified on cross-examination that, before retaining his attorney, he “did not know anything about any incorporation or association.” Juliano further testified that he had no evidence indicating that the homeowners’ dues had been misappropriated.
Unjust enrichment occurs when
“ ‘ “(1) the donor of the benefit ... acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit ... engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched.” ’ ”
Mantiply v. Mantiply, 951 So.2d 638, 654-55 (Ala.2006) (quoting Welch v. Montgomery Eye Physicians, P.C., 891 So.2d 837, 843 (Ala.2004), quoting in turn Jordan v. Mitchell, 705 So.2d 453, 458 (Ala.Civ.App.1997)); see also Wyeth, Inc. v. Blue Cross & Blue Shield of Alabama, 42 So.3d 1216 (Ala.2010). To properly support a claim of fraudulent misrepresentation, the plaintiff must provide evidence of “(1) a false representation; (2) of a material existing fact; (3) reasonably relied upon by the plaintiff; (4) who suffered damage as a proximate consequence of the misrepresentation.” Padgett v. Hughes, 535 So.2d 140, 142 (Ala.1988).
In this case, it is apparent that, when he paid his homeowners’ dues, Juliano did not rely on any representation that the Associ *245 ation was a corporation. See Hunt Petroleum Corp. v. State, 901 So.2d 1, 4 (Ala.2004) (“Reliance requires that the misrepresentation actually induced the injured party to change its course of action.”). Based on his testimony, when Juliano made his first payments, he had not been misinformed by anyone that the Association was a corporate entity. As he further testified, Juliano paid his homeowners’ dues in 2005 and 2006 without any knowledge of the corporate status of the Association. He later paid the homeowners’ dues in 2007 and 2008 after the Association had been formally incorporated and with full knowledge of the prior failure of formal incorporation. At no point was the nature of the business organization of the Association material to Juliano’s decision to pay his homeowners’ dues. See Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 611 So.2d 238, 244 (Ala.1992) (“A ‘material fact’ is a fact of such a nature as to induce action on the part of the complaining party.”). Juliano failed to present evidence to support his fraudulent-misrepresentation and unjust-enrichment claims relating to the payment of homeowners’ dues. The trial court, therefore, erred in awarding any damages on account of those claims.
In paragraph 34 of his unjust-enrichment claim, Juliano asserted:
“34. Juliano has also invested time, money, and expense in installing steps and maintaining property which is on the common area. Pursuant to the Covenants, the Residential Association (i.e., the Willow Lakes Residential Association, Inc.) is responsible and required to maintained all common areas and has failed and refused to do so.”
As for any theory that the Association has been unjustly enriched by the construction of the steps, that claim fails based on our disposition of the Association’s counterclaim in which we concluded that the Association did not receive any benefit from the construction of the steps, which violated the restrictive covenants. To the extent that the trial court awarded damages to Juliano based on that theory, its judgment is due to be reversed.
Juliano presented evidence indicating that, before moving into his home, he cleared an area of thick brush behind the Julianos’ property, which was later determined to be partially on the common area. In his complaint, Juliano evidently sought to be paid by the Association for clearing the common area under the theory of quantum meruit. A claim of quantum meruit, or quasi-contract, is a request for equitable relief based on the principle “ ‘ “that if one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one who so accepts with knowledge, to pay the reasonable value of such services rendered.” ’ ” Carroll v. LJC Defense Contracting, Inc., 24 So.3d 448, 458 (Ala.Civ.App.2009) (quoting Frank Crain Auctioneers, Inc. v. Delchamps, 797 So.2d 470, 474 (Ala.Civ.App.2000), quoting in turn Richards v. Williams, 231 Ala. 450, 453, 165 So. 820, 823 (1936)). In their appellate briefs, the Association and its codefendants argue only that the doctrine of unclean hands prevents Juliano from recovering under his quantum meruit theory. However, the Association and its co-defendants have waived that argument by failing to explain how that equitable doctrine applies to prevent Juliano from recovering. See Davis v. Sterne, Agee & Leach, Inc., 965 So.2d 1076 (Ala.2007) (appellant’s lone citation to a general principle of law without explaining its specific relevance to her action against financial-services company was insufficient to meet the requirements of Rule 28(a)(10), Ala. R.App. P., to cite relevant authority in support of arguments). The trial court, *246 therefore, did not commit reversible error by failing to bar any recovery on the theory that Juliano had unclean hands.
However, the Association and its code-fendants have argued that the record does not contain evidence to support the amount of the damages awarded to Juli-ano. Juliano testified that he hired two men to clear the property and that they started the clearing process the last weekend of July 2005 and completed the job in early August 2005, working a total of five days. Juliano’s son, who owned a landscaping company, then performed “a little improvement” for Juliano for “a day or two.” Juliano did not offer any evidence regarding the costs incurred by him for the clearing project or present any evidence as to the reasonable value of the clearing services. Without such evidence, the record does not contain any basis for an award of damages under Juliano’s quantum meruit theory. See Associates Commercial Corp. v. Roberts, 844 So.2d 1256, 1262 (Ala.Civ.App.2002) (reversing judgment on quantum meruit claim based on lack of evidence of reasonable value of services provided). We therefore reverse the judgment to the extent it awarded damages based on the quantum meruit theory.

The Slander Claims

In another count of his complaint, Charles Juliano asserted that the Association had issued a letter to all the homeowners in the subdivision that contained intentionally false statements that disparaged Juliano. At trial, Juliano testified as to several letters and notices that were sent to all the homeowners in the subdivision, which he alleged contained false statements that had disparaged him. Because Juliano claimed damages for alleged false statements published in written form, he actually attempted to prove that the Association and its codefendants had libeled him. First Indep. Baptist Church of Arab v. Southerland, 373 So.2d 647, 648 (Ala.1979) (“Libel is commonly perceived as a defamation which springs from the publication of written or printed material.”). Libel consists of “ ‘any false and malicious publication, when expressed in printing or writing, or by signs or pictures, ... which ... tends to bring an individual into public hatred, contempt, or ridicule ....’” Bowling v. Bow, 293 Ala. 178, 182, 301 So.2d 55, 58-59 (1974) (quoting McGraw v. Thomason, 265 Ala. 635, 639, 93 So.2d 741, 744 (1957)).
Essentially, the letters and notice of which Juliano complains inform the homeowners of the ongoing status of the dispute between the Julianos and the Association regarding the construction of the steps on the common area next to Tom Sawyer Lake. The first letter indicates that Juli-ano had threatened legal action, prompting the Association to retain legal counsel, whose fees the Association intended to collect from Juliano, but which might have to be paid by a special assessment in the meantime in the event the funds in the Association’s treasury did not adequately cover those fees. The second writing consists of a notice to all the homeowners in which Harrington, acting as the president of the board of the Association, informed the homeowners that the board had been unable to resolve the dispute over the steps amicably, resulting in the instant lawsuit in which Juliano “threatened” “the very existence” of the Association and that had caused the Association to incur $20,000 in legal fees that would have to be paid by special assessment. The third letter informed the homeowners that Juliano was seeking thousands of dollars in damages that, if awarded, ultimately would have to be paid by the homeowners. Juli-ano complained that those, and one additional writing, led some of his neighbors to *247 treat him contemptuously, believing he was personally responsible for increasing their homeowners’ dues.[15]
In order to sustain a cause of action for libel, it is not enough that the defendant’s statements lead to the disparagement of the plaintiff; those statements must be false and defamatory. See Tidwell v. Winn-Dixie, Inc., 502 So.2d 747, 748 (Ala.1987). The statements made in the letters and notices do not contain any false statements or allegations. The fact is that Juliano did threaten legal action and did institute a lawsuit in which he sought a declaration that the Association was not properly incorporated and, thus, did not exist. Juli-ano also claimed damages against the Association, whose treasury was funded entirely by dues and assessments paid by the individual homeowners in the subdivision. Consequently, any damages recovered from the Association would, in fact, be payable by the homeowners.
Moreover, in order to be libelous, the communication must be directed to a third party. Hoover v. Tuttle, 611 So.2d 290 (Ala.1992). Communications among the directors of a homeowners’ association and the homeowners regarding an ongoing dispute that could result in an increase in homeowners’ dues are of the type of intra-organizational communication protected under Alabama law. See generally Nelson v. Lapeyrouse Grain Corp., 584 So.2d 1085 (Ala.1988) (recognizing that intra-corporate communication among management and employees is protected to the extent the communication to the employees falls within the proper scope of the employees’ knowledge and duties). In this instance, the publications of the letters and notices were directed solely to the homeowners in the subdivision, whose interests were at stake in the litigation. The authors did not direct the communications to any “third party” within the meaning of Alabama law.
For the foregoing reasons, the trial court erred to the extent it awarded damages to Juliano on account of his libel claims.

The Deprivatioii-of-Property-Rights Claim

Section 3.01 of the restrictive covenants states:
“Subject to the terms and conditions of the Declaration and the rules, regulations, fees and charges from time to time established by the Board [of the Association], Developer does hereby grant to each Owner and Occupant the nonexclusive right, privilege and easement of access to and the use and enjoyment of the Common Areas in common with the Developer.”
Pursuant to § 3.01, Charles Juliano had the right to access and use the common area immediately behind the Julianos’ property. At trial, Juliano claimed that the Association and its codefendants had impaired that right by placing tape and barriers across the steps for several months. In its judgment, the trial court allowed Juliano to amend his complaint to assert “deprivation of property rights” as an additional claim, and it awarded Juliano $20,000, based in part on that claim.
On appeal, the Association and its codefendants correctly argue that Juliano’s right of access to, and use of, the common *248 area did not authorize him to construct steps across the common area and to use those steps to gain access to the lake and its surroundings. Section 3.01 specifically provides that the right, privilege, and easement granted to Juliano as a homeowner in the subdivision is “subject to the terms and conditions of the Declaration and rules.” This court determined above that the restrictive covenants precluded Juliano from constructing the steps on the common area. Alabama law recognizes that an easement holder generally has a right to damages for unreasonable interference with the use of an easement, but only when such use is in a manner consistent with the purposes of the easement. See Duke v. Pine Crest Homes, Inc., 358 So.2d 148 (Ala.1978). It follows that an easement holder cannot recover damages for interference with a use that violates the terms of the easement. Because Juliano had no right to build steps for his use on the common area, he cannot claim any deprivation of that right. To the extent the trial court awarded damages for deprivation of the use of the steps, its judgment is reversed.

The Trespass Claims

Charles Juliano also alleged in his complaint that the Association, its codefen-dants, and their representatives trespassed on the Julianos’ property. At trial, Juliano testified to three separate instances of alleged trespass. The first occurred when Zavatti came onto the Julianos’ land with surveyors for the purpose of obtaining a definitive professional survey of the property in order to establish the line separating the Julianos’ property from the common area. The second occurred when a man working under Zavatti’s direction came to the Julianos’ door to inquire as to the location of the barrier behind the Juli-ano property, which the man had been assigned to repair. The third instance occurred when Harrington and Van Gilder repaired tape surrounding the steps after members of the Julianos’ family tore it down during a Sunday afternoon visit.
Article 3.04 of the restrictive covenants grants the Association and its agents
“a permanent and perpetual nonexclusive easement appurtenant, over, across, through and upon each Lot and Dwelling and for the purpose of provided ingress to and egress from each lot and Dwelling and for (a) inspecting each Lot and Dwelling and Improvements thereon in order to determine compliance with the provisions of this Declaration and (b) performance of the respective duties ... hereunder, including, without limitations, taking any action required or permitted to be taken by the Developer, the ARC and the Association pursuant to any of the terms of provisions of this Declaration.”
Section 6.37 of the restrictive covenants charges the Association with the duty of taking all necessary action to extinguish or correct violations of the restrictive covenants and grants the Association the power to enter onto any lot for that purpose. Section 12.11 further provides that,
“[wjhenever the Association, ... and [its] respective agents, employees, representatives, successors, and assigns, are permitted by this Declaration to enter upon or correct, repair, clean, maintain or preserve or do any other action within a portion of a Lot or Dwelling, the entering thereon shall not be deemed a trespass.”
By impliedly agreeing to the foregoing provisions when he purchased the lot, Juliano consented to the entry upon the Julianos’ land by the Association and its representatives for the purposes of enforcing the restrictive covenants. A party who has consented to entry upon his land *249 by a homeowners’ association cannot maintain an action for trespass when such entry conforms to that consent. See Murphy v. Timber Trace Ass’n, 779 S.W.2d 603 (Mo.Ct.App.1989). Our research has not revealed any cases allowing a homeowner to unilaterally revoke his or her consent once impliedly granted through a restrictive covenant.
In this case, each of the entries onto the Julianos’ property was committed by representatives of the Association for the purposes of investigating or abating violations of the restrictive covenants. Those entries fell within the scope of the consent given to the Association by Juliano in the restrictive covenants. Even if the acts occurred before August 22, 2006,[16] when the Association properly formed a corporation, a majority of a quorum of the homeowners ratified those acts at the January 8, 2007, meeting, transforming them into acts of the incorporated Association. See generally Warwick Dev. Co. v. GV Corp., 469 So.2d 1270, 1276 (Ala.1985) (“Even though promoters or initial incorporators are not technically agents of the corporation to be formed, once the corporation is formed and the new corporation ratifies the acts of its promoters and incorporators, the corporation succeeds to all the rights and remedies, as well as the liabilities, which the promoters and initial incorporators had acquired before incorporation.”). Thus, Juli-ano could not complain that his consent did not include entry by representatives of the unincorporated Association.
We further note that Ala.Code 1975, § 34 — 11—2(d)(1), provides a privilege to surveyors to enter portions of land without trespassing. Section 34 — 11—2(d)(1) provides:
“A professional land surveyor may go on, over, and upon the lands of others which is not enclosed by any device installed to deter entry to or exit from industrial facilities or plant sites by humans or vehicles, if necessary to perform surveys for the location of section corners, quarter corners, property corners, boundary lines, rights-of-way, and easements, and may carry and utilize equipment and vehicles. Entry under the right granted in this subdivision shall not constitute trespass. A professional land surveyor shall not be liable to arrest or to a civil action for trespass by reason of this entry.”
Because the surveyors who accompanied Zavatti cannot be liable for trespassing onto the unfenced portion of the Julianos’ property, which is the part Juliano testified had been entered upon, no liability can be imputed to the Association or its code-fendants on account of any actions of the surveyors. Hollis v. City of Brighton, 885 So.2d 135, 142 (Ala.2004) (“[I]f a putative servant is not liable, either because he is innocent or because he is immune, no liability exists to be visited upon the putative master under the rule of respondeat superior.”).
Based on the foregoing, the trial court erred in awarding any damages to Juliano on account of his trespass claims and its judgment in that regard is reversed.

Conclusion

In summary, we reverse the judgment of the trial court in its entirety. We remand the case with instructions that the trial court vacate its judgment and enter a new judgment granting the declaratory relief requested by the Association and denying the claim for injunctive relief, the claim of unjust enrichment, the claim of quantum meruit, and the tort claims seeking damages requested by Juliano. We further instruct the trial court to conduct further *250 proceedings for the purpose of determining the costs and reasonable attorney’s fees to be awarded to the Association for enforcing the restrictive covenants.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.

. The appellants timely filed their notice of appeal to the supreme court; that court determined that the appeal fell within this court’s appellate jurisdiction ánd, accordingly, transferred the case to this court.

. The Association later withdrew the options after realizing that it would have to obtain the consent of every landowner in the subdivision in order to convey a part of the common areas.

. Section 10-3A-81 provides:
"(a) Amendments to the articles of incorporation shall be made in the following manner:
"(1) If there are members entitled to vote thereon, the board of directors shall adopt a resolution setting forth the proposed amendment and directing that it be submitted to a vote at a meeting of members entitled to vote thereon, which may be either an annual or a special meeting. Written notice setting forth the proposed amendment or a summary of the changes to be effected thereby shall be given to each member entitled to vote at such meeting within the time and in the manner provided in this chapter for the giving of notice of meetings of members. The proposed amendment shall be adopted upon receiving at least two-thirds of the votes entitled to be cast by members present or represented by proxy at such meeting.
"(2) If there are no members, or no members entitled to vote thereon, an amendment shall be adopted at a meeting of the board of directors upon receiving the vote of a majority of the directors in office.
"(b) Any number of amendments may be submitted and voted upon at any one meeting.”

. For that reason, we find no need to address the propriety of the trial court’s finding that the Association's August 24, 2006, filing did not comply with § 10-3A-81.

. In its judgment, the trial court noted that, in two collateral actions filed in Jefferson Circuit Court, the Association had denied that it had existed as a corporation before August 22, 2006, and had obtained a summary judgment in both cases based on that representation. That argument in no way conflicts with the argument made by the Association in this case that it became a corporation on August 22, 2006. Hence, the doctrine of judicial estop-pel does not prevent the Association from asserting standing on the basis of its incorporation on August 22, 2006. That doctrine only “ ' "applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted.” ' ” Ex parte First Alabama Bank, 883 So.2d 1236, 1241 (Ala.2003) (quoting Jinright v. Paulk, 758 So.2d 553, 555 (Ala.2000), quoting in turn Selma Foundry & Supply Co. v. Peoples Bank & Trust Co., 598 So.2d 844, 846 (Ala.1992), quoting in turn Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir.1988)).

. The Association argued alternatively that it also had standing because it operated as a de facto corporation before August 22, 2006, that the Julianos were estopped to deny its corporate existence, and that it had acted validly as an unincorporated association. Because we decide that the Association had standing as a de jure corporation, we need not address those issues.

. The Association points to other sections of the restrictive covenants arguably applicable to the steps, but we conclude that the trial court reasonably could have determined that those sections did not apply.

. We note that the evidence is in conflict as to whether the Julianos were provided some notice during construction of the steps that the construction violated the restrictive covenants, but we assume the trial court resolved that conflict favorably to the Julianos.

. In its final judgment the trial court did not explain why the steps should remain simply because they complied with "the general scheme of development.” That phrase appears in Wright v. Cypress Shores Development Co., 413 So.2d 1115 (Ala.1982), in which the supreme court held that a developer who has reserved the right in restrictive covenants to unilaterally amend or annul those restrictive covenants may do so as long as the developer *239 exercises that right "in a reasonable manner consistent with [the] general scheme or plan of development” of the subdivision. 413 So.2d at 1124. The supreme court adopted that rule in order to protect the reasonable expectations of homeowners who had purchased property in a subdivision subject to the original restrictive covenants from arbitrary changes made by the developer who maintained unilateral control over those covenants. This case involves not an amendment to the original restrictive covenants by a person with the express authority to do so, but a violation of the existing restrictive covenants committed by a homeowner without any authority. The test adopted in Wright simply has no application to this case and does not provide any sound legal basis to prevent the enforcement of the restrictive covenants.

. The Association also requests this court to reverse the judgment insofar as it does not contain a declaration that the Julianos violated the restrictive covenants by clearing the land behind their property; however, the Association has not made any legal or factual argument on that point and has thereby waived the issue. See Rule 28, Ala. R.App. P.

. The Association does not argue that the Julianos must remove the portion of the steps lying entirely within their property lines; therefore, we find no error in that part of the judgment allowing the Julianos to maintain those steps.

.In its appellate brief, the Association also cited §§ 6.37 and 7.02 of the restrictive covenants as grounds for its right to recover attorney’s fees and costs; however, we conclude that the Association did not bring those provisions to the attention of the trial court before or during the trial and that, therefore, the Association may not, for the first time on appeal, raise the applicability of those provisions. See Norman v. Bozeman, 605 So.2d 1210, 1214 (Ala.1992) (“Our review is limited to the issues that were before the trial court— an issue raised on appeal must have first been presented to and ruled on by the trial court.”).

. We note that the record indicates that the invoices did not include the amounts charged for trying the case. On remand, we instruct the trial court to consider not only the invoices submitted at trial, but also all evidence relating to the amount of attorney's fees incurred through the trial and the posttrial proceedings relating to enforcement of the restrictive covenants.

. The Association adopted the arguments made by its codefendants in their appellate brief regarding the unjust-enrichment claim and the various tort claims filed by Charles Juliano. We find that Juliano did not suffer any prejudice by that briefing method, so we reject his objection to the same.

. Although the argument was not raised by the Association or its codefendants, we note that such writings regarding ongoing litigation ordinarily are treated as absolutely privileged communications in other jurisdictions. See, e.g., Black v. Green Harbour Homeowners’ Ass’n, 19 A.D.3d 962, 798 N.Y.S.2d 753 (2005); and Healy v. Tuscany Hills Landscape & Recreation Corp., 137 Cal.App.4th 1, 39 Cal.Rptr.3d 547 (2006).

. The record is unclear as to the date of each alleged trespass.