THOMAS, Judge.
Pope, McGlamry, Kilpatrick, Morrison & Norwood, P.C. ("the firm"), appeals a judgment of the Etowah Circuit Court ("the trial court") denying its request for an award of attorney fees for its representation of Jason DuBois. We affirm.
Background
In August 2011, DuBois was working on a railroad crew that was traveling from Virginia to Maryland and was forced to jump from a runaway rail vehicle that was traveling more than 60 miles per hour. His injuries were severe and included skull, neck, and back fractures and swelling and bruising of his brain; he was hospitalized for several months and required ongoing treatment and rehabilitation. This appeal involves a dispute regarding whether the firm should receive attorney fees stemming from litigation regarding DuBois's injuries.
After the severity and longevity of DuBois's injuries became clear, his uncle and holder of his power of attorney, Steve DuBois ("Steve"), contacted an attorney, Walter Gray, on DuBois's behalf about pursuing litigation to seek compensation for DuBois's injuries. Steve contacted Gray because Gray had represented him in the past and because they had been friends for many years. Gray referred Steve to David Rayfield, who was a partner in Pope, McGlamry, Kilpatrick, Morrison & Norwood, LLP ("the partnership"), an entity that had been created in Georgia before the formation of the firm. Rayfield advised Steve that, due to the nature and complexity of a potential suit seeking damages for DuBois's injuries, obtaining the services of an attorney with more relevant experience would be prudent. Rayfield thereafter introduced Steve to another partner in the partnership, George Walker III, who was from Etowah County and was experienced with the court system there.
Steve met with Walker several times and independently researched his professional accomplishments and reputation. After concluding that Walker was a skilled and experienced trial attorney, Steve entered into an agreement ("the fee contract") with the partnership and Gray's law firm, Gray Legal Firm, P.C., which were referred to collectively in the fee contract as "LAW FIRMS," on behalf of DuBois to secure the representation of Rayfield and Walker for litigation related to his injuries. In relevant part, the fee contract provided:
"CLIENT is employing LAW FIRMS, and/or any other attorney or law firm hired by or associated with same, to investigate the potential of recovery through workers' compensation and against third parties who are or which may be legally responsible, in whole or in part, for damages sustained by CLIENT arising from an August 27, *1067 2011 accident in Maryland ... and to prosecute those claims if merited.
"LAW FIRMS will receive as their attorneys' fees fifteen percent (15%) of any compensation recovered through workers' compensation, or such other amount as set by the trial court in an amount not to exceed fifteen percent (15%) of the compensation recovered. LAW FIRMS will also receive as their attorneys' fees forty (40%) of any recoveries obtained on behalf of CLIENT by LAW FIRMS from third parties outside of workers' compensation, whether by settlement or trial.
"Said attorneys agree to charge nothing for their services if nothing is received or recovered. In the event of any recoveries by settlement and/or judgment of claims arising as a result of the above, the [partnership's] out-of-pocket expenses will be deducted from the gross recovery, and attorneys' fees shall be based on net recovery after deduction of expenses ....
"....
"LAW FIRMS may, at any time upon reasonable notice, refuse to continue in this personal services contract, but if this termination is at no fault of CLIENT, LAW FIRMS forfeit their right, if any, to any fee for services rendered.
"....
"If CLIENT discharges LAW FIRMS, LAW FIRMS will be owed a fair value for services rendered up to the termination of the agreement."
Among the attorneys involved, it was also agreed that Gray Legal Firm, P.C., would ultimately receive all the attorney fees stemming from any workers' compensation claim, namely 15% of that recovery amount, in addition to 20% of the attorney fees stemming from any other claims. With the exception of Walker, Rayfield, and an associate who was employed by the partnership, Shaun O'Hara, Steve had little to no contact with any of the partnership's attorneys regarding its representation of DuBois.
In November 2011, the firm was formed in Georgia. There was no written assignment of the partnership's assets or liabilities to the firm. It appears, however, that all the partners in the partnership became shareholders in the firm and that the firm took over the responsibility of handling the partnership's cases.
In June 2012, DuBois filed a complaint in the trial court against several defendants that included a workers' compensation claim and several tort claims. On DuBois's complaint, Walker and Rayfield were listed as DuBois's counsel on behalf of the firm, and the partnership was not referenced on the complaint. Gray was listed as DuBois's counsel on behalf of Gray Legal Firm, P.C. Over the next few years, the case proceeded through the initial phases of discovery. The record indicates that, from the outset, Steve had understood that DuBois's case would progress slowly because DuBois had not yet reached maximum medical improvement. See Equity Grp.-Alabama Div. v. Harris, 55 So.3d 299, 303 (Ala. Civ. App. 2010) ("In order to recover permanent-disability benefits [under a workers' compensation claim], an employee must have reached maximum medical improvement.").
In February 2015, Walker withdrew as a shareholder in the firm after having been diagnosed with a serious form of cancer. Whether he voluntarily left is disputed, but, in June 2015, Walker's employment with the firm terminated. As a result of the firm's increased focus on mass-tort litigation, Rayfield also left the firm in July 2015 to seek work in other types of litigation. That same month, Steve sent a *1068 letter to the firm, which read, in relevant part:
"Pope McGlamry:
"It is my understanding that David Rayfield will be leaving your firm on July 17, 2015. Although I have been advised that I have the option to continue with Pope McGlamry as counsel in the above-styled matter, I have decided that I want Mr. Rayfield to remain [DuBois]'s lawyer instead.
"Accordingly, accept this letter as notice of termination of Pope, McGlamry, Kilpatrick, Morrison & Norwood, PC as counsel in the above-styled case. I ask that you please provide me with [DuBois]'s file on this case by July 17, 2015, or alternatively, you may provide the file to Mr. Rayfield upon his departure from the firm.
"Thank you for your assistance."
In August 2015, the firm filed a motion to intervene in DuBois's action pursuant to Rule 24(a), Ala. R. Civ. P., and included a verified complaint seeking an attorney-fee lien under § 34-3-61, Ala. Code 1975, based on the terms of the fee contract and the theory of quantum meruit. Additionally, the firm sought an award of $80,388.45 as reimbursement for expenses that it had allegedly incurred during its representation of DuBois. The trial court granted the firm's motion to intervene the next day. In August 2016, the trial court conducted a hearing regarding the firm's claim at which it heard arguments of counsel, DuBois and the firm stipulated to certain facts, and certain documentary evidence was admitted; the trial court did not, however, receive ore tenus testimony at that hearing.
In September 2016, the trial court entered orders indicating that DuBois had settled the claims set forth in his complaint. DuBois's tort claims were dismissed with prejudice pursuant to the terms of a confidential settlement agreement after the tort defendants paid into court certain sums required by the agreement. The joint stipulation of dismissal regarding those claims was signed by Walker and Rayfield as DuBois's attorneys. In a separate order, the trial court incorporated by reference a settlement agreement reached between DuBois and the workers' compensation defendant and, pursuant to the terms of that agreement, ordered the trial-court clerk to pay from DuBois's settlement funds received from the tort defendants $150,000 to the workers' compensation defendant "as full and complete satisfaction of [its] liens and/or subrogation claims/interests." That settlement agreement is signed by Walker as DuBois's attorney. Following entry of the trial court's September 2016 orders, the only claim still pending was the firm's claim against DuBois for attorney fees and reimbursement of expenses.
The trial court conducted a trial regarding the firm's claim on October 18, 2016, at which it received ore tenus testimony from Rayfield; Steve; a shareholder of the firm and founding partner of the partnership, Paul Kilpatrick; and a local attorney, George Ford. On November 2, 2016, the trial court entered a judgment that included lengthy factual findings and determined that the firm could not enforce the fee contract because of its own breach, that the firm was not a real party in interest, that the firm lacked capacity to maintain its claim under § 10A-1-7.21, Ala. Code 1975, and that the firm had failed to meet its burden of proving that it was entitled to an award of attorney fees. Accordingly, the trial court's judgment awarded the firm no attorney fees and no reimbursement for expenses.
The record indicates that the firm is seeking as attorney fees an award of a portion of DuBois's confidential settlement proceeds from the tort defendants that *1069 were deposited with the trial-court clerk; the amount of those funds still on deposit appears to be a six-figure sum. The firm timely filed a notice of appeal of the trial court's judgment to the Alabama Supreme Court on November 30, 2016. On December 21, 2016, the supreme court issued an order transferring the appeal to this court and indicating that it was within our subject-matter jurisdiction pursuant to § 12-3-10, Ala. Code 1975, presumably after concluding that it was an appeal in a workers' compensation case. The parties thereafter provided this court with appellate briefs, and the appeal was submitted for our consideration on April 25, 2017.
Because, upon initial review, it appeared that this appeal involves an attorney-fee dispute that does not require examination of the workers' compensation statutory framework and because the amount involved appeared to far exceed the $50,000 limitation imposed upon this court's subject-matter jurisdiction by § 12-3-10, we sought confirmation from the supreme court that this court has subject-matter jurisdiction over this appeal. On May 1, 2017, the supreme court issued an order rescinding its December 21, 2016, order and instead transferring the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975. This court therefore has subject-matter jurisdiction.
Analysis
On appeal, the firm argues that each legal conclusion set forth in the trial court's judgment is erroneous. Whether the firm is a real party in interest and whether the firm has capacity to maintain its claim under § 10A-1-7.21, Ala. Code 1975, are issues that do not implicate subject-matter jurisdiction; therefore, for purposes of the following analysis, we assume without deciding that the firm could properly seek enforcement of the terms of the fee contract in the trial court. See Ex parte Scottsdale Ins. Co., 180 So.3d 1, 1 (Ala. 2015) (Murdock, J., concurring specially)("[A] claim may fail for lack of support in the law or in the facts, including, in the case of a claim of breach of contract, a lack of proof of the existence of a contract between the plaintiff and the defendant. Such a failure, however, is a failure on the merits, not a failure of standing .... And the prospect of failure of a claim on such grounds certainly does not deprive the trial court of ... subject-matter jurisdiction."), and Wausau Dev. Corp. v. Natural Gas & Oil, Inc., 144 So.3d 309, 312 (Ala. 2013) (quoting Penick v. Most Worshipful Prince Hall Grand Lodge F & A M of Alabama, Inc., 46 So.3d 416, 425 (Ala. 2010) )(" 'A foreign corporation's failure to obtain authorization to do business in Alabama is a capacity defense and does not per se implicate standing and subject-matter jurisdiction.' ").
Whether based on the terms of the fee contract or the theory of quantum meruit, the firm seeks an award of a reasonable fee, or the fair value of its services, and reimbursement of its expenses for its representation of DuBois under § 34-3-61, Ala. Code 1975. See Harlow v. Sloss Indus. Corp., 813 So.2d 879, 887 (Ala. Civ. App. 2001) ("Pursuant to § 34-3-61, Ala. Code 1975, and its predecessors, an attorney may establish his [or her] right to an attorney-fee lien either through contract or on the theory of quantum meruit."). We first therefore consider the general propriety of the firm's request.
In Goldberg & Associates, P.C. v. Donohoe, 777 So.2d 144, 146 (Ala. Civ. App. 2000), this court considered a factually similar case in which a plaintiff hired a law firm to represent him in a workers' compensation action. Id. at 144. The plaintiff thereafter terminated the law firm's representation, and the lawyer working on the plaintiff's case left the law firm and filed a *1070 notice of appearance in the workers' compensation action. Id. After a settlement was reached, the law firm intervened in the workers' compensation action seeking a "quantum meruit lien on the attorney fee awarded in that action." Id. at 145. The trial court entered a judgment denying the law firm's request for an award of attorney fees, and the law firm appealed the trial court's judgment to this court. Id.
On appeal, we reversed the trial court's judgment and concluded that "the law is clear that an attorney may obtain a lien for the reasonable value of services rendered, on the theory of quantum meruit.... [T]he trial court erred in failing to award some portion of the attorney fee in [the] workers' compensation action to [the plaintiff's] former attorneys, [the law firm]." Id. at 146. However, Goldberg is distinguishable from this case in at least one important respect.
As we noted in Goldberg, the trial court's judgment in that case was entered without receiving ore tenus evidence, and we therefore afforded the judgment no presumption of correctness. Id. at 145. In this case, however, the trial court conducted a trial at which it received ore tenus testimony, and, as noted above and quoted in part below, its lengthy judgment contains specific findings and determinations regarding its evaluation of the witnesses' testimony and credibility.
" ' "The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses." Hall v. Mazzone, 486 So.2d 408, 410 (Ala. 1986). The rule applies to "disputed issues of fact," whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So.2d 669, 672 (Ala. 1995). The ore tenus standard of review provides:
" ' "[W]here the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court's conclusion on issues of fact, and this Court will not disturb the trial court's conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence." '
" Reed v. Board of Trs. for Alabama State Univ., 778 So.2d 791, 795 (Ala. 2000) (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala. 1977) )."
Yeager v. Lucy, 998 So.2d 460, 463 (Ala. 2008).
In support of its claim, the firm first presented the testimony of Kilpatrick, who testified that he had practiced law for more than 51 years. Kilpatrick agreed that the only attorneys who had worked directly on DuBois's case during the firm's employment were Walker, Rayfield, and O'Hara, and he described the work done during that time as "extensive." Kilpatrick also testified that, during that time, the firm was compensating Walker, Rayfield, and O'Hara and had been incurring costs for overhead expenses.
Regarding the amount of time spent working on DuBois's case, Kilpatrick testified that the firm did not keep hourly records because its fees were generally earned on a contingency basis. He also stated, however: "We have calendar entries. We have pleadings. We have discovery. We have depositions. So we can pretty much approximate any amount of work that's gone on." Thus, the primary documentary evidence offered by the firm consisted of contemporaneous logs ("the logs") that had been created by Rayfield's assistant at the firm and appear to document each item of correspondence, discovery, *1071 and pleading related to DuBois's case during the firm's employment. However, the logs do not indicate the amount of time required to complete each task or, for the entries related to discovery and pleadings, which of the firm's three attorneys performed which aspects of those tasks or whether any portions of those tasks were performed by assistants who were not attorneys.
In addition to the logs, the firm also offered as evidence a written estimate prepared by Kilpatrick of what he testified was a reasonable number of hours that would be required to complete the tasks specified in the logs. Although portions of Kilpatrick's testimony indicate that he did not read every item of correspondence, discovery, or pleading referenced on the logs, other portions of his testimony indicate that he might have reviewed at least some of those documents in addition to the logs. Kilpatrick's estimate indicates that he assigned 30 minutes to each of 201 items of correspondence, or approximately 100 hours total; 5 hours to each of 68 items of plaintiff's discovery, or approximately 340 hours total; 3.5 hours to each of 143 items of defendant's discovery, or approximately 500.5 hours total; 30 hours for each of 9 depositions, which included time for travel and preparation, or approximately 270 hours total; 8 hours for each of 38 items of pleading, or approximately 304 hours total; 20 hours for each of 4 meetings with expert witnesses, or approximately 80 hours total; 50 hours for each of the firm's lawyers for their research, travel, and attendance related to a mediation, or approximately 150 hours total; and 6 hours for a research memorandum that had been prepared by O'Hara. Altogether, Kilpatrick estimated that the firm had spent approximately 1,750.5 hours working on DuBois's case.
Kilpatrick also testified that, at the time of trial, the firm was seeking an award of $58,528.60 as reimbursement for expenses paid during its employment in the DuBois case. Although the firm had requested an award of $80,388.45 for those expenses in its verified complaint that he had signed, Kilpatrick admitted that total had improperly included certain interest charges, and he testified that the firm had agreed to remove certain other charges during the pendency of the litigation. Regarding the interest charges, Kilpatrick's testimony indicated that the firm had allocated interest to DuBois's case using a methodology that included interest accrued on expenses for other cases and interest accrued on overhead expenses.
During cross-examination, Kilpatrick testified that he had not been directly involved in the firm's representation of DuBois but that he had discussed the case with O'Hara. When asked by DuBois's attorney whether he "had personal knowledge of the extent or the amount of the work that was done," Kilpatrick testified: "Other than the logs and the discussions. That's right. I mean, I don't have personal knowledge of it." DuBois's attorney also asked Kilpatrick a series of questions demonstrating that Kilpatrick did not know the actual amount of time that it had taken to complete several specific tasks listed on the logs.
As mentioned above, the firm also called Ford to testify in support of its claim. Ford testified that he had practiced law in Etowah County for 44 years and that he was familiar with the fees charged by local attorneys for various types of litigation. Ford testified that most of his personal experience as a defense attorney regarding attorney fees was "based principally on civil rights cases, employment cases, discrimination, and so forth." Regarding DuBois's case, he testified that he had reviewed *1072 a mediation statement "and some other things as well," which appears to have included at least the pleadings. When asked by the firm's attorney to provide an opinion regarding an appropriate rate for attorney fees in DuBois's case, Ford offered the following testimony:
"A. All right, sir. With respect to the-Mr. Walker, I think, is the most experienced lawyer. I would think in a federal court setting or a complex case setting there, his fee would be at least $350 an hour. Here I would not say that. I would say perhaps as much as [$]300. Mr. Rayfield's experience I think was somewhere less than that. His would be [$]250 to [$]275, maybe [$]225 to [$]275. And probably $200 an hour for the young associate who worked on the thing[, O'Hara].
"Q. All right. And I don't know any other way to do it. But could you have you come to some conclusion, if you blended those rates between the three, what a reasonable rate would be in your mind?
"A. Well, my recollection was that the youngest associate had less hours, from what I recall discussing. I would say [$]250 to [$]275."
In other words, the firm presented evidence indicating that the total fair value of its representation ranged between $437,625 and $481,387.50, plus $58,528.60 as reimbursement for its paid expenses.
In response, DuBois called Rayfield to testify regarding, among other things, the work that had been done during the firm's employment. Rayfield testified that, in the beginning, he had done most of the work on DuBois's case and that O'Hara had not contributed a great deal, specifically stating the following during direct examination by DuBois's attorney: "[N]ow, look, I enjoyed having his company in depositions, but he didn't ask any questions. He didn't do anything to get ready for them. He kept me company." After testifying that he had experience working as a defense lawyer, he stated that he would not have been able to bill a defendant for O'Hara's level of participation in DuBois's case. Rayfield also testified that Walker had not performed any work during that time "[e]xcept ... maybe ... some work getting ready for the mediation."
Regarding Kilpatrick's estimation that 1,750.5 hours of work had been performed by the firm on DuBois's case, Rayfield testified: "This is one of the most ridiculous things I have ever seen in my life." Upon examination by DuBois's attorney, he elaborated as follows regarding certain specific items:
"Q. I will hand you exhibits Six and Seven collectively. And these are just representative examples of non-privileged communication; is that correct?
"A. This is-it is.
"THE WITNESS: And, you know. Your Honor, one of these-Exhibit Six, January 17th, 2013 letter to [an attorney], I didn't even prepare this. I wouldn't have prepared any letter like this. It is just a cover letter prepared by [my assistant] at the time that says, 'Enclosed are copies of discovery responses.' She would bring it in, and I would sign it. This other one ... here-
"Q. (By Mr. Walker) Let me stop you. If you had dictated this, it wouldn't have taken you seven minutes. That's a .1, isn't it?
"A. It is. And I have-in my practice, I don't even charge .1 [of an hour, or six minutes,] per correspondence. I might have multiple e-mails and correspondence. They get lumped into maybe one .1 for a group of them at a time. I didn't know what Mr. Kilpatrick's methodology was. I brought these in to show they wouldn't have even been .1. I didn't *1073 know he was going to assign .5 to it. That's the most ridiculous thing I have ever heard. I don't know-there is not a single correspondence on here I could imag[ine] that took me a half hour to do. I wouldn't have assigned .1 to most of these. These are form letters. There [are] letters sent out to medical providers. I didn't even look at those. It was just a copy ... that [my assistant] sent to the address and filled out. I signed it as it was going on. [My assistant] said, 'Here, sign these,' and I would sign five or six of them. Exhibit Seven, this was mailed to another lawyer, and we were copied on it saying, 'Hey, here is a copy of the transcript of the deposition taken in the case,' and they were sending the original to him. That's not anything I would have spent any time on. I don't know for sure if I would have even seen that. I don't even know-I think it's beyond rationally explaining how you could average .5 or a half hour for a correspondence, including an e-mail. I think that's just preposterous.
"Q. Well, what else-I mean, I don't want you guessing, but do you have personal knowledge-I mean, this 1750 hours is just pulled in out of the air-
"A. It's not remotely close. It's-it's-I wouldn't even know-there is no basis in fact to any of this. And the thing that-I can't tell you for sure how much time I would have spent on this even if I went back and looked at the actual document. And I did. But there is no way for Mr. Kilpatrick to assign anything just looking at a log. This is something I had [my assistant] prepare so if I ever needed to find a correspondence again that I would know where it was.
"Q. It was an index?
"A. It was. It was an index. So if you look at tab 73, it was a letter ... [']Notice of taking deposition enclosed.['] All right. So for that, according to Mr. Kilpatrick, he charged a half hour for a letter saying a copy of the deposition notice is enclosed. Then he would have charged for a discovery filing five hours for sending the notice of discovery. He would have charged another five hours for me sending a notice of a deposition. So we put ten and a half hours on that right there. And the time of all that I don't think I would have spent 15 minutes on it.
"A. What about 150 hours for the mediation?
"Q. That's where I can tell you confidently that I did not spend 50 hours on that. I think it's silly to assume that [Kilpatrick] or [Walker] or [O'Hara] did either. The 211 discovery filings, he has five hours for notices of taking depositions for certificates of discovery. There is maybe-our first response to their interrogatories might have taken five hours. There is nothing else on here that would have come close that I have seen. This is-I just-he's absolutely pulling that out of air. It's not based on any experience he has. No one has this experience. It doesn't take that long to do this. And Mr. Kilpatrick hasn't been involved in the litigation for years. Not since I have been there. He has been very involved in the office work and handling-and dealing with clients and talking to them. But as far as any filings and preparing any discovery, he's not done it since I have been with the firm. I don't know if he doesn't know or if he's just guessing or somebody told him to do this, but there is no basis for this. And it has no basis in fact of what he has put down here. Now, the pleadings are just as obnoxious. A notice of appearance, eight hours. I can't come up with a pleading in here that would have be-I don't know if the original complaint took me eight hours.
*1074 "Q. Were there any dispositive motions filed?
"A. No. There was not a summary judgment motion filed in this case. There was not a motion to dismiss filed in the case.
"Q. Were there any motions to compel filed against the plaintiff?
"A. No, we didn't have to file one.
"Q. The plaintiff filed one motion to compel-one collective motion to compel, I guess, multiple defendants?
"A. Yes.
"Q. And then the defendants conceded it when we got to court, didn't they?
"A. That's correct.
"Q. All right.
"A. There [are] motions to withdraw by counsel in that they put eight hours to. [The trial court's] order here granting the motion to withdraw, which would have been-I guess I would have looked at it, when it came across the Alafile, for 30 seconds. The same with motion to withdraw, notice of change of address of [a defendant]'s counsel. It's not believable.
"Q. And some of this work-some work was done that related to the work comp case?
"A. That's correct.
"Q. In fact, the majority of the work early on dealt with dealing or helping the DuBoises deal with the comp carrier and the medicals and that stuff?
"A. Yes. They had a caseworker assigned to it. And that's a lot of the work [O'Hara] did, was coordinating with that. Now, [O'Hara] did some other stuff too.
"Q. And the firm was not to be compensated for any of the comp. That was we're just doing that as kind of a favor?
"A. That was. That was basically as part of the referral fee."
Rayfield further testified regarding Walker's increased involvement in DuBois's case after DuBois discharged the firm and offered specific examples of the work that had been done at that time. He stated that DuBois's case had become "incredibly complicated" and "incredibly time consuming" and agreed with DuBois's attorney that the work done after "the mediation," which occurred shortly before DuBois discharged the firm, was the work that had resulted in DuBois's settlement. When asked by the firm's attorney during cross-examination to assign a percentage to the work performed on DuBois's case before DuBois discharged the firm, Rayfield testified:
"I would say especially when you ... exclude [O'Hara]'s time, where he was kind of tagging along with me, that the vast majority of the time was afterwards. But I can't assign a percentage. I can't say that's what percentage it would be. I just can't-can't do that."
The following exchange also occurred between the firm's attorney and Rayfield regarding the value of the work that Rayfield had performed while the firm represented DuBois:
"Q. And you're not-you're certainly not saying that the work you did before you left the firm on the DuBois case was de minimis or worthless?
"A. I don't think so. Now, it just depends on if you are judging it by the value to the client. We weren't able to get anything to him before I left. I didn't think it was worthless. I thought all [m]y time on the case was-
"Q. I mean, it was work that had to be done?
"A. For the most part, yes."
Regarding the $58,528.60 in expenses that the firm was seeking, Rayfield testified during cross-examination by the firm's *1075 attorney: "That's what I would have sent to the client if I was doing it." He also testified, however, that he had learned of the firm's improper allocation methodology regarding interest after the firm's completion of two other cases and had informed Kilpatrick that the methodology was improper in approximately May and June 2015.
Finally, DuBois called Steve to testify, who offered the following relevant testimony regarding who should receive attorney fees:
"Well, Your Honor, I think that when I hired ... Walker to handle this case for me, whether he stayed with th[e] firm or not, I wasn't going to lose him as my lawyer. I had one hundred percent confidence that he would get to a settlement [s]tage with this case. I feel like the first three years of this case that it was at [the firm,] nothing was done except for the workers' comp case. And when I say the workers' comp case, I went to them with mileage report sheets to get filled out, and ... O'Hara filled them out for me.... [T]hat was the extent of it. They never talked about nothing. You know, I always had [Rayfield] inform me-or [Rayfield] would get with me and ask me how [DuBois] was doing. He was the only one in the firm that ever talked to me about [DuBois]. It was [Walker], [O'Hara], and [Rayfield]. And I feel like [DuBois], in the situation he is [in] and the condition he is [in]-and me being self-employed has took five years of my life away from me having to take care of him. And that's the only reason I was able to take care of him is because I was self-employed. I feel like [DuBois] needs every dime and every penny he can get to survive the rest of his life. And I think this enormous fee they come in here with, 80 something thousand dollars up front, claiming they had against charges to me on this case-and then they come back and reduce it to 50 something thousand. And I would have never known that without [Walker] checking into it for me. He's the one that had to confront me to tell me that's what was happening. And I-I went to a lawyer that I could trust, that I thought I could trust and would do the right thing for me. He-he told me that these charges right here are not real charges. They are not what they are supposed to be. They are overcharging you for what they have done. So as far as the case goes, I don't think they deserve a penny of [DuBois]'s money. I think Mr. Walker and Mr. Rayfield [are] the one[s] that did the work in this case. And I think they deserve everything."
After considering the foregoing evidence, the trial court included in its judgment the following relevant evaluation and analysis regarding the firm's claim:
"Initially, there has been a complete failure of proof by [the firm] as to the establishment of any exact amount of the attorney fee claimed or the 'fair value' of any 'services rendered,' as the employment contract provided.... The only testimony in support of the fee was from the corporate representative[, Kilpatrick,] who admitted he had no personal knowledge of the DuBois matters. The testimony consisted of an 'estimate' as to hours based off reviewing indexes of filings and correspondence prepared by a secretary. No attempt was made to actually review the underlying documents and their content that were referenced in the indexes. The corporate representative randomly assigned time to each category on the indexes, i.e., correspondence, pleadings and discovery. Counsel for [DuBois] timely objected to the 'testimony.' The Court finds that the purported 'evidence' to establish the 'estimate'
*1076 of hours to be unreliable and hearsay. See, e.g., Government Street Lumber Co. v. AmSouth Bank, 553 So.2d 68, 77-78 (Ala. 1989) (testimony of witness based on study of file to opine as to amount of attorney fees, inadmissible hearsay); Crawford v. Hall, 531 So.2d 874, 875 (Ala. 1988). Alternatively, the Court finds the testimony to not be credible. The Court has examined its own orders and the filings in the case and is confident the time randomly assigned bears no reasonable relationship to the actual time it would have taken to either read or prepare most all of the documents listed on the indexes. What the 'evidence' amounted to was speculation and subjective 'beliefs,' neither of which constitute personal knowledge. See Hall v. Harris, 504 So.2d 271 (Ala. 1983).
"The corporate representative[, Kilpatrick,] was not tendered or qualified as an expert. Even if he had been so tendered, he must have 'opined' from facts in evidence or a hypothetical question, neither of which occurred. See Ala. R. Evid., [Rule] 703 ; Crawford, supra, at 875, ; Alabama Power Co. v. Robertson, 447 So.2d 148 (Ala. 1983). The Merriam-Webster dictionary defines an 'estimate' as an opinion, judgment; a rough or approximate calculation. As such, to the extent the proffered testimony is or should be deemed an opinion, the Court rejects it in its entirety as not credible and not based on any actual facts from which the opinion could have been based. The Court relies on and finds credible the testimony of Mr. Rayfield, who undeniably had personal knowledge, that the 'hours' testified to by the representative of [the firm] bore no relation whatsoever to whatever hours were actually spent.
"Lastly, [the firm] offered no testimony of any witness relating to many of the Peebles v. Miley, 439 So.2d 137 (Ala. 1983), factors that must be applied in the context of determining a reasonable attorney fee award. See Triplett [v. Elliott, 590 So.2d 908,] 910 [ (Ala. 1991) ]. There was no breakdown of which lawyer did what. [The firm]'s expert witness, [Ford,] who is a highly respected lawyer in the community, merely opined as to general rates in Etowah County, which the Court accepts as accurate, but was not asked to discuss the Peebles factors; nor could those rates actually be assigned to any identifiable work by a specific lawyer. There was testimony that much of the work done at [the firm], whatever that work entailed, related to the work[ers'] compensation claim for which no fee was due to [the firm]. The Court is left to speculate, which it cannot do, as to how much work was done, who did it, or what its value was. Accordingly, as to the fee claim, the Court finds there has been an absence of proof by [the firm]."
As the trial court noted in its judgment, our supreme court articulated the relevant factors that should be considered regarding attorney-fee awards in Peebles v. Miley, 439 So.2d 137 (Ala. 1983), and has since repeated those criteria, providing the following guidance:
"The determination of whether an attorney fee is reasonable is within the sound discretion of the trial court and its determination on such an issue will not be disturbed on appeal unless in awarding the fee the trial court exceeded that discretion. State Bd. of Educ. v. Waldrop, 840 So.2d 893, 896 (Ala. 2002) ; City of Birmingham v. Horn, 810 So.2d 667, 681-82 (Ala. 2001) ; Ex parte Edwards, 601 So.2d 82, 85 (Ala. 1992), citing Varner v. Century Fin. Co., 738 F.2d 1143 (11th Cir. 1984).
*1077 "This Court has set forth 12 criteria a court might consider when determining the reasonableness of an attorney fee:
" '(1) [T]he nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances.'
" Van Schaack v. AmSouth Bank, N.A., 530 So.2d 740, 749 (Ala. 1988). These criteria are for purposes of evaluating whether an attorney fee is reasonable; they are not an exhaustive list of specific criteria that must all be met. Beal Bank v. Schilleci, 896 So.2d 395, 403 (Ala. 2004), citing Graddick v. First Farmers & Merchants Nat'l Bank of Troy, 453 So.2d 1305, 1311 (Ala. 1984).
"We defer to the trial court in an attorney-fee case because we recognize that the trial court, which has presided over the entire litigation, has a superior understanding of the factual questions that must be resolved in an attorney-fee determination. Horn, 810 So.2d at 681-82, citing Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)."
Pharmacia Corp. v. McGowan, 915 So.2d 549, 552-53 (Ala. 2004).
As already mentioned, the firm's appellate brief challenges each legal conclusion reached in the trial court's lengthy judgment. In the portion of its appellate brief regarding the excerpt of the trial court's judgment quoted above, the firm asserts that "admissible evidence clearly supported the amount of the firm's claimed fees and expenses" and argues that the facts of Government Street Lumber Co. v. AmSouth Bank, 553 So.2d 68, 77-78 (Ala. 1989), and Crawford v. Hall, 531 So.2d 874, 875 (Ala. 1988), are distinguishable from the facts of this case because, it says, "[b]oth [of those] cases share a common thread: the affiants, who were non-parties, failed to identify what specific documents they reviewed before coming up with their opinion-much less offer the specific documents into evidence." The firm further argues that the logs were detailed, "going so far as to identify each sender of correspondence, the general topic of each letter, the gist of each deposition, and the style of each pleading," and cites Isbell v. Alabama Power Co., 477 So.2d 281, 284 (Ala. 1985), in support of its argument. Assuming that the firm's contentions are correct, however, does not diminish the trial court's determination that Kilpatrick's testimony was not credible, a decision with which this court is generally unable to disagree, having not observed and evaluated, among other things, the witness's demeanor. See Yeager, 998 So.2d at 463. Moreover, Rayfield's testimony would support a conclusion by the trial court that it was not feasible to reasonably estimate the time that the firm had spent working on DuBois's case by examination of the logs that formed the basis of Kilpatrick's testimony or by a simple review of the documents that had been filed in the trial court. Additionally, the trial court's judgment specifically indicates that it reviewed the record and found that "the time randomly assigned bears no reasonable relationship to the actual time it would have taken to either read or prepare most all of the documents listed on the indexes."
*1078 Citing, among other cases, Beal Bank, SSB v. Schilleci, 896 So.2d 395, 403 (Ala. 2004), the firm also notes that the Peebles factors referenced in the trial court's judgment are not exhaustive and that a judge may draw upon his or her own experience in setting an attorney-fee award. Regarding those factors, however, the firm specifically argues:
"The court's record and the testimony at the final hearing touched on the experience and reputations of the lawyers involved, the hourly value of their services in the marketplace, the amount of time consumed over the four years the case was with the [f]irm, the complexities of the case, the terms of the ... fee contract, the amount of legitimate and reasonable expenses, and the end result-all relevant evidence for the court to consider when analyzing the Peebles factors."
We must therefore consider the evidence presented at trial in relation to the Peebles factors; we do so, however, in a different order than enumerated above.
At the outset, we note that no evidence was presented indicating that either DuBois or Steve had had a prior professional relationship with the firm, that the firm's representation of DuBois had precluded it from taking other cases, or that DuBois or Steve had imposed any time limitations on the firm. Thus, the trial court could have reasonably concluded that factors (9), (11), and (12) were inapplicable to the firm's request for an award of attorney fees. As it relates to the remaining factors, we note the following regarding the evidence presented at trial.
A. The nature and value of the subject matter of the employment; the learning, skill, and labor required; and the attorney's experience and reputation.
The record indicates that DuBois's tort claims culminated in a substantial economic settlement, but it was undisputed that settlement was reached after DuBois had terminated the firm's employment. Rayfield testified that he had done the vast majority of the work on DuBois's case during the firm's representation of DuBois, and his testimony generally indicated that, although he believed that the work he had done was valuable and necessary, it was not especially complex or difficult. Furthermore, Rayfield noted that many of the items for which the firm sought compensation were tasks that required little or no professional judgment on his part.
Rayfield's testimony also contrasted the work done during the firm's employment with the work done after its discharge, specifically describing the latter as "incredibly complicated" and "incredibly time consuming." Finally, although evidence was presented at trial indicating that Rayfield was an experienced and competent attorney, no evidence was presented demonstrating that he had the type of specialized experience that Walker possessed. Indeed, Steve's testimony indicated that he had entered into the fee contract for the specific purpose of obtaining the services of Walker, not Rayfield.
B. The attorney's responsibilities; the fees customarily charged in the locality; and whether the fee is fixed or contingent.
Although the firm's employment in DuBois's case presumably required Rayfield to communicate with both DuBois and Steve on occasion, the firm represented only one client, DuBois, in this matter, and the record indicates that Steve had made most decisions on DuBois's behalf. Furthermore, no specific evidence was presented indicating that Rayfield's responsibilities during the firm's representation of DuBois were inordinately significant;
*1079 for example, the testimony did not reveal that Rayfield had advised Steve regarding any decisions that had substantially or irrevocably impacted DuBois's rights. Additionally, as the trial court noted in its judgment, Ford testified regarding a reasonable local rate for attorney fees, but the firm presented no evidence distinguishing the work done by Walker, Rayfield, or O'Hara or distinguishing the work done on DuBois's tort claims as opposed to his workers' compensation claim.
Finally, the record demonstrates that, although the fee contract provides that the firm's fee was contingent, the specific provision that the firm seeks to enforce provides that the firm receive the "fair value" of its services because DuBois terminated the firm's employment. In Peebles, our supreme court stated that, generally, "an attorney on a contingent fee basis is entitled to charge more than an attorney who is guaranteed compensation by periodic billings." 439 So.2d at 142. The supreme court's statement, however, assumes that the attorney seeking the fee "wins" by obtaining a favorable result on behalf of the client and should, therefore, be rewarded for his or her gamble. Id. As discussed in more detail below, the evidence presented at trial indicated that it was not the firm's work on DuBois's case that resulted in his substantial economic settlement but, rather, the work that was done after the firm's employment was terminated.
C. The measure of success achieved.
It was undisputed that neither DuBois's workers' compensation claim nor his tort claims were resolved during the firm's employment. Moreover, Rayfield and Steve testified that a substantial portion of the work performed during the firm's employment related to DuBois's workers' compensation claim, the settlement of which resulted in an agreement that the workers' compensation defendant receive $150,000 from the settlement proceeds of DuBois's tort claims and did not result in an economic award in favor of DuBois or an award of attorney fees. The testimony presented also showed that the firm had not initially expected to receive attorney fees stemming from its representation of DuBois regarding his workers' compensation claim and that it had not expected to receive 20% of the attorney fees stemming from DuBois's tort claims, because it had agreed to pay those proceeds to Gray as a referral fee.
Furthermore, by definition, an attorney's contingent fee becomes payable only upon the successful disposition of the client's case. In this case, only a portion of DuBois's claims resulted in an economic recovery, the firm presented no evidence of the time spent working on those specific claims, and Rayfield's testimony specifically indicated that it was the work done after the firm was no longer employed by DuBois that had resulted in the substantial economic settlement of DuBois's tort claims. Therefore, the "fair value" of the firm's representation should be considered in light of the testimony presented indicating that a substantial portion of its work had yielded no economic recovery for DuBois and the absence of evidence distinguishing that work from the firm's other work.
D. The reasonable expenses incurred.
Among other things, the trial court specifically stated the following in its judgment regarding the firm's expenses:
"Additionally and alternatively, [the firm] has admitted breaching the [fee] contract by improperly charging unlawful interest to DuBois. [The firm] initially sought to recover in its verified Complaint in Intervention interest which was *1080 later discovered to include charges that vastly exceeded the maximum that could be charged (if interest could be charged at all). The improper charges included interest charged for general overhead, which included money borrowed to pay lawyers their draws. The representative of [the firm, Kilpatrick,] admitted that such practices, which had gone on for years, were both in violation of the [fee] contract and[,] more disturbingly, potentially in violation of the Rules of Professional Conduct. The overcharges were approximately $23,000.00 for interest and other charges. In fact, it appeared that the law firm charged interest at a rate of 65% for a single month. A party who has breached a contract should not be allowed to sue for breach of that same contract. In equitable parlance, it is referred to as the 'clean hands' doctrine. See Dixson [v. C. & G. Excavating, Inc., 364 So.2d 1160 (Ala. 1978) ]. While ordinarily the Court would be inclined to award at least all legitimate expenses advanced and proven, here the Court cannot sanction the admitted misconduct. The evidence establishes that the law firm was notified in advance of the Complaint in Intervention filed in this case, that it was improper to charge interest the way it had been doing; yet, it continued to do so and did not seek to amend its pleadings until after this came to light at the final hearing.... The Court is of the opinion that such admitted misconduct taken alone warrants not awarding fees or expenses to [the firm] in this case."
On appeal, the firm does not argue that the interest charges included in its complaint were proper. Rather, it focuses on the fact that it later agreed to remove those charges, and it contends that DuBois was not harmed by the inclusion of those charges in its complaint. In response to the firm's assertion that DuBois was not harmed by its misconduct, DuBois argues the following in his appellate brief:
"[The firm] attempts to take refuge in the fact that because [the firm] got caught before it could actually collect the illegal interest, DuBois was not damaged and[,] hence, [the firm] was not in breach of the [fee] contract. This ignores the fact that DuBois had to incur time and expense in defending [the firm]'s improper claim, and that the assertion in the verified [c]omplaint for improper interest caused, at a minimum, nominal damages in having to defend against it. Abandoning a frivolous claim after being caught is no basis to later avoid the effects of one's prior actions."
In support of its argument, the firm cites caselaw for the following proposition: " ' "[N]ot every partial failure to comply with the terms of a contract by one party ... will entitle the other party to abandon the contract at once." ' " Harrison v. Family Home Builders, LLC, 84 So.3d 879, 889 (Ala. Civ. App. 2011) (quoting Birmingham News Co. v. Fitzgerald, 222 Ala. 386, 388, 133 So. 31, 32 (1931), quoting in turn 6 R.C.L. p. 926).
There is no indication, however, that DuBois had intentionally breached or abandoned the fee contract; instead, he submitted himself to the jurisdiction of the trial court to resolve the firm's claim against him. The express term of the fee contract that the firm seeks to enforce provides only that it be compensated for the "fair value" of its services, a calculus that necessarily entails examination of the parties' actions and conduct. Moreover, it was the firm that initiated litigation regarding its fee and sought a determination from the trial court regarding the "fair value" of its services. In other words, the firm chose the rubric to be used in assessing its compensation, the forum in which the issue would be decided, and the manner *1081 in which it would be determined, namely forgoing negotiation with DuBois and choosing instead to try its claim in open court before the trial court at an ore tenus hearing. Thus, the question is not whether DuBois could properly abandon the contract in light of the firm's actions but, rather, whether, in its assessment of fairness, the trial court could have properly denied the firm's request for reimbursement of expenses after hearing all the evidence presented regarding the firm's actions.
Sufficient evidence was presented at trial from which the trial court could have concluded that, despite knowing of the impropriety, the firm had averred in its complaint that DuBois should be required to pay the improperly included interest charges. Both Kilpatrick and the firm's attorney signed the complaint. Rule 11(a), Ala. R. Civ. P., which provides the appropriate procedure regarding the signing of, among other things, pleadings provides, in relevant part: "If a pleading ... is signed with the intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading ... had not been served." After determining that the firm lacked a reasonable basis for the averments set forth within its complaint regarding the amount of expenses allegedly owed by DuBois, the trial court acted within its discretion in refusing to consider the firm's request for an award of those expenses. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (discussing Rule 11 of the Federal Rules of Civil Procedure, which is similar to Rule 11, Ala. R. Civ. P., and noting that "the central purpose of Rule 11 is to deter baseless filings in district court and thus ... streamline the administration and procedure of the federal courts").
E. The time consumed.
The evidence presented at trial through Kilpatrick and Rayfield developed for the trial court's consideration two concrete alternative theories regarding the time spent working on DuBois's claims during the firm's employment: either the firm spent approximately 1,750.5 hours working on DuBois's case or some other, much smaller, unspecified number of hours. After concluding that Kilpatrick's testimony was not credible, the trial court was therefore left with two additional options: either evaluate the logs and the record and assign its own reasonable temporal valuation for each task or simply decide that, as Rayfield testified, doing so was not reasonably feasible and that the firm had failed to meet its burden of proof.
The firm concedes that setting an award of attorney fees was within the trial court's discretion, see, e.g., Pharmacia Corp, 915 So.2d at 552, but argues that that discretion was limited, specifically asserting that the court "did not have the discretion to find that no fee could be awarded based on this evidence. Indeed, [the firm contends,] in nearly every case where a client is represented on a contingency fee basis, attorneys do not keep contemporary time records." (Emphasis in original.) In its reply brief, the firm also cites this court's decision in Willow Lake Residential Association, Inc. v. Juliano, 80 So.3d 226, 242-43 (Ala. Civ. App. 2010), for the proposition that "if after considering the appropriate factors, a trial court concludes that the billed attorney's fees are unreasonable in amount, the appropriate action is not to deny the claim altogether but to enter a judgment for a reasonable amount of attorney's fees." Although the principle articulated in Willow Lake is correct, its application presupposes, as was the case in that appeal, that the party seeking an *1082 award of attorney fees has introduced actual bills, or some other reliable evidence, demonstrating the amount of work done. See id. at 241 ("[T]he Association called its attorney to testify as to the legal fees incurred by the Association in enforcing the restrictive covenants; the Association also introduced the bills submitted by its attorney to substantiate those fees." (emphasis added)). The record in this case demonstrates that the firm presented no such documentation.
We acknowledge the practical reality that law firms whose receipt of fees is contingent upon the success of their clients' litigation may not ordinarily document the time spent working on those cases as meticulously as law firms who routinely bill their clients for such time; however, the fee contract in this case, the express terms of which the firm seeks to enforce, does not simply provide for a contingent fee. Rather, the fee contract specifically contemplates the possibility of DuBois's termination of the partnership's employment, a circumstance under which the partnership, or the firm, would be entitled to the "fair value" of its services.
"Applicants for an attorney fee bear the burden of proving their entitlement to an award and documenting their appropriately expended hours. [Ex parte] Edwards, 601 So.2d [82,] 85 [ (Ala. 1992) ]; see also Hensley [v. Eckerhart], 461 U.S. [424,] 437, 103 S. Ct. 1933[, 1941 (1983) ] (citing the importance of documenting in fee applications the hours expended). 'The applicant should exercise "billing judgment" with respect to hours worked, and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.' Hensley, 461 U.S. at 437, 103 S.Ct. 1933 (citation omitted)."
City of Birmingham v. Horn, 810 So.2d 667, 682 (Ala. 2001).
In order to establish the "fair value" of its services, the firm was responsible for documenting the basis for its claim in a reasonable manner. Put another way, it was undisputed that Walker, Rayfield, and O'Hara were the firm's employees during its representation of DuBois. In light of its advance consideration that its employment might be terminated, it was incumbent upon the firm to ensure that its employees maintained some reasonable, contemporaneous documentation of the time spent working on DuBois's case, and it bore the risk of failing to do so.
In the seminal case establishing the "lodestar method" of attorney-fee calculation, the United States Court of Appeals for the Third Circuit noted the following when considering a district court's decision regarding attorneys' fees in the settlement of a class action under federal law:
"[T]he first inquiry of the court should be into the hours spent by the attorneys-how many hours were spent in what manner by which attorneys. It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney. But without some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates, the court cannot know the nature of the services for which compensation is sought."
Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973). As it relates to a court's ability to evaluate the amount of time spent by attorneys working on a particular case, we find the Third Circuit's logic persuasive, and we conclude that the trial court acted within its discretion *1083 in determining that the firm had failed to meet its burden of providing "some fairly definite information as to the hours devoted to" DuBois's case and that the trial court therefore lacked sufficient evidence upon which to formulate an award of attorney fees. Id.
Conclusion
In Peebles, our supreme court noted the difficulty associated with cases of this nature and, in the end, concluded: "Because of the sensitive nature of the problem of attorney's fees, the litigants and the public would be better served if [the] attorneys in this case, and their clients, attempted to settle these differences without further resort to the courts." 439 So.2d at 144. See also Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of the fee."). In light of DuBois's traumatic injuries, the events that unfolded over the course of his litigation, and the economic considerations involved, we echo our supreme court's sentiment here.
After consideration of the relevant Peebles factors, however, we decide that the trial court could have reasonably concluded that the firm had failed to meet its burden of proving that it was entitled to an award of attorney fees. Furthermore, even assuming that the trial court erred in determining that the firm was not a real party in interest and that it lacked capacity to enforce the fee contract, "[t]his court may affirm the trial court's judgment for any legitimate reason supported by the record." Evans v. Waldrop, 220 So.3d 1066, 1073 (Ala. Civ. App. 2016), cert. denied, Ex parte Evans, 220 So.3d 1074 (Ala. 2016). Because the trial court's decision that the evidence presented by the firm failed to meet its burden of proof is supported by the record, we affirm the trial court's judgment.
AFFIRMED.
Pittman, J., concurs.
Thompson, P.J., and Moore and Donaldson, JJ., concur in the result, without writings.